UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

TIMOTHY BARTH,

    Defendant
_____/

Case No. 16-20831

Hon. Victoria A. Roberts

Sara D. Woodward (P73784)
Deputy Chief, General Crimes Unit
United States Attrorneys Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
313.226.9180
sara.woodward@usdoq.gov

David S. Steingold (P29752)
Law Offices of David S. Steingold, PLLC
400 Monroe Street, Suite 280
Detroit, Michigan 48226
313.962.0000
detroitdefender@yahoo.com

## SENTENCING MEMORANDUM

  Dr. Timothy Barth is scheduled to be sentenced by this Court on Thursday, August 10, 2017 on his plea to receipt of child pornography. The charge carries a five year minimum sentence, and up to 20 years imprisonment. The guidelines are either 168-210 months or 97-121 months, depending on this Court's ruling on the applicability of USSG § 2G2.2(b)(5).

  That guideline would add five points to Barth's offense level computation, and is the only aspect of the guidelines in dispute.

**Unresolved Objections to Presentence Report**

The first unresolved objection is to paragraph 13, located on pages 6 and 7 of the Presentence Report. This is the paragraph that recites the claims made by a niece of defendant, claiming that some 25 years ago, she was molested by Timothy Barth.

The probation officer attempted to resolve part of the objection by including the language from Barth's objection in the paragraph. As indicated in the Addendum, however, it has not resolved the entire objection.

It was Bona Barth, Timothy Barth's wife, who agreed to allow CB to live at their house with her daughter, but refused CB's request to have the daughter live with them alone.

What is important about that event is that it runs contrary to the claim CB's claims that she had been molested by Timothy Barth. It simply makes no sense that she would allow her daughter to live with a man she believed molested her and at least one other of her cousins. It is not incoincidental that CB's claims and the complaint that she made to the Washtenaw Sheriff's Department was after the Barths refused her request to raise her daughter.

Paragraph 13 goes on to claim that the "investigation revealed two former minor female relatives, who are now adults, who were victims of alleged child sexual abuse by Barth." Only one person claims to have been molested, and that is CB. The person referred to as KZ has never come forward, has never made a report, and that includes never having reported it to the authorities, to her parents, Bona Barth, or to anyone else.

Justin Carreon, a nephew of Barth, claims that both CB and KZ had revealed to him, when they were teenagers, that they had been abused by Barth. KZ will not

2

confirm the statement. Carreon continues to state his "belief," yet there is no explanation about why Justin Carreon, KZ or even CB never reported this incident to anyone until CB made a report to the Washtenaw County Sheriff after the Barths refused to raise her daughter.

Bona Barth has offered a cogent explanation as to why these allegations were made, but that is just her belief. It is about money and jealousy. Her letter is appended to the Motion for Release from Detention.

The reality is that Timothy Barth has never been confronted with these allegations by any of the accusers, and has never had an opportunity to cross-examine them. There is no forensic proof of these matters, no polygraph or other device was used to try and determine whether this was a blatant lie or whether there is any truth to the allegations. Attempts to interview are believed to have been solely with the other two nieces, KZ and Heidi Barin. No adults were interviewed. Certainly no other interview or request has been forwarded to defense counsel.

The circumstances of the alleged assault in or around 1991 are highly suspect. It is undisputed in the reports that Dr. Barth treated CB for an illness at the family's request, and in the presence of the entire family at a family reunion. The allegations that CB sat on Barth's lap, covered with a blanket, in the presence of the entire family, while he fondled her is asking this Court to believe that CB not only said nothing at the time this was occurring, or later that day to her mother, but said nothing at all about the incident until she was a teenager in an unspecified year, at an unspecified time, when Justin Carreon claims she revealed this molestation to him.

The claim is that it occurred at the Barth residence. However, the Barths did not move to this residence until 1993. CB first visited there when she was seventeen (17), after her daughter was born.

As for KZ, we have absolutely no indication of when this alleged molestation occurred, how old she was, where it occurred, and, specifically, what occurred. We have only her cousin, Justin Carreon, repeating whatever he claims to have heard from KZ. The fact that KZ will neither confirm any of this information, nor even agree to an interview, should cause this Court to reject the allegations as pure speculation and without an adequate evidentiary foundation.

Also germane to this issue is the attached letter from Dr. Heidi Barin, the third niece who Justin Carreon originally claimed had been molested by Barth. There is simply no truth to these allegations.

The defense strongly objects to the assumption that these claims are true without proof, without confrontation and cross-examination at a hearing, and contends that Justin Carreon's beliefs and hearsay allegations about what he was told or believed from KZ should certainly be stricken from the Presentence Report.

The second unresolved objection is to paragraph 14 at page 7. This paragraph includes statements of Justin Carreon and his "belief" that Barth had abused KZ on more than one occasion but less than ten times. There is absolutely no factual basis for that at all. There is no claim that KZ told Justin Carreon these facts. There is no indicated basis for the belief. He does not explain why he would not have shared that information with his parents, the parents of KZ, the parents of CB, or the authorities.

4

The original Presentence Report contained the allegation in paragraph 14 that Justin Carreon identified HB as a potential victim, which has been directly refuted by Dr. Barin, the person referred to as HB. While the probation officer removed the part of the paragraph referring to HB, the original allegation is noted as it bears strongly on Barth's claim that the paragraph that includes anything other than what CB allegedly told Justin Carreon is pure speculation and should be stricken.

The third objection is to paragraph 24 on pages 8 and 9. If the Court sustains the first two objections, then paragraph 24 should be removed.

The fourth objection is to paragraphs 30 and 34 on page 9. It is the same objection as number 3. If the five point enhancement is removed from the computation of the Offense Level, then all of these paragraphs should change.

The next objection, number 5, is to paragraph 71 on page 18. It is not the province of the probation officer to agree with the Government. That usurps the function of this Court. The probation officer's job is to gather the facts and present them to the Court, and not make an ultimate determination on a disputed guideline. The Probation Officer's opinion, based solely on allegations, should be rejected. The burden must be placed on the Government to prove these allegations with something more than has been presented to date. The part of paragraph 17 that indicates "the probation department agreed with the Government that the specific offense characteristic is applicable" should be deleted.

## 18 USC § 3553 Factors

Dr. Timothy Paul Barth is a 67-year old, retired, physician. This case represents his first serious criminal contact. The only previous instances were a juvenile

detainment detailed in the Presentence Report, and a ticket he received while in college for selling encyclopedias in the state of Indiana without a license.

Dr. Barth has one child and two grandchildren. That child, Benjamin Barth, is not Dr. Barth's biological son. Dr. Barth adopted Ben and, for all intents and purposes, he is Dr. Barth's son.

Timothy Barth is not a child molester. He has never been formally charged with any such offense, and vociferously denies any suggestion that he has ever improperly touched a child.

Since this case began, in fact before formal charges were brought, Timothy Barth began treatment with Dennis Sugrue, a psychiatrist specializing in the treatment of sexual disorders. A copy of Dr. Sugrue's *curriculum vitae* is attached as Exhibit A.

In order to obtain a risk assessment, it was necessary to find a psychologist who could reveal his or her findings without violating the doctor-patient relationship. Dr. Barth was recommended to Birmingham Maple Clinic and, specifically, Dr. Dan O'Neil.

Dr. O'Neil's *curriculum vitae*, report and recommendations are attached hereto as Exhibit B. The assessment included a clinical interview, review of discovery, consulting with Dr. Sugrue, and nine separate tests. The conclusion of Dr. O'Neil is that there are <u>no signs</u> of Timothy Barth being a sexual predator toward minors. He finds there to be a low rate of recidivism and suggests controls with continued therapy.

Exhibit C is a letter from Dr. Heidi Barin, the niece of Dr. and Mrs. Barth. This letter is perhaps more important than anything else that Timothy Barth can put before the Court pertaining to the allegations of child molestation as well as attesting to his

6

otherwise outstanding character. It is firsthand information from one of the nieces Justin Carreon "believes" was molested by Dr. Barth.

Dr. Barin acknowledges receiving a call from a Homeland Security investigator, suggesting that she may have been a victim of sexual abuse. Her response to the Homeland Security officer, contained in this letter, has always been the same; "Uncle Paul was appropriate, helpful, and generous towards me growing up." Dr. Barin relates her history with the person she refers to affectionately as "Uncle Paul." She relates how Dr. and Mrs. Barth paid for her and her sibling to go to Catholic school in Cincinnati after they were forced by family situations to live with cousins in that city.

Here are a few comments made about Uncle Paul:

"Growing up as a first generation college graduate, I was blessed to Have the support and encouragement of several family members, this includes Tita Bona and Uncle Paul. I have alwas wanted to be a doctor, so naturally Uncle Paul (Dr. Timothy Paul Barth) was a role model. I remember Uncle Paul as a hard worker, an introvert, somewhat shy, but kind to all our family members . . . . They were kind, generous and helpful to all.

"Sometime during my senior year, I began email correspondence with my Uncle Paul. As a medical doctor, he supported and encouraged my dreams. It was then I decided I wanted to become an eye doctor, specifically an optometrist. I graduated high school with honors and was accepted into a prestigious private college in Houston. I was given a partial scholarship. While I do not recall the exact details, my Uncle and Tita began financially helping me through my attendance at University of St. Thomas . . . . They

7

supported me with a stipend to cover room and board biweekly.

"Uncle Paul has always treated me with kindness, respect and generosity. I never had an encounter with him that was age or relationship inappropriate. He was extremely encouraging and hopeful in my success to become the first doctor amongst my cousins.

"Being part of a large family, with many cousins close to my age, I have no recollection of my cousins or family members saying anything different to me."

The letter of Dr. Heidi Barin reflects the real Timothy Barth. He has never had an inappropriate relationship with any minor. To the contrary, he has been a mentor, role model and supporter of Dr. Barin and many other members of his family

Also attached as Exhibit D is a letter from Father N. Arokiaselvan, from St. Xavier's Church. This outstanding character letter details the faith and generosity of Dr. Barth. While Dr. Barin attests to what has already been previously told to this Court, that Dr. and Mrs. Barth have financially assisted brothers, sisters, nieces and nephews throughout their lives, this shows that Dr. Barth's generosity is not limited to family.

Dr. and Mrs. Barth are extremely devout Catholics. In the opening paragraph of the letter, Father Arokiaselvan describes his love for Dr. Barth and indicates that "my personal and spiritual development, ministry and family have been greatly blessed by his commitment to our Lord and his personal support and generosity toward this church and its clergy." The letter describes how Father Arokiaselvan had come to this country from India on a mission in 2007. Because of her daily presence and volunteer activities in the church, he became friends with Bona Barth. He soon after met Dr. Barth and

8

adopted them as his surrogate parents in the United States. The Barths incorporated Father Arokiaselvan into their family life and activities.

Father Arokiaselvan's appreciation of Dr. Barth became greater due to "his generous, fatherly, and solicitous involvement in my life."

Father Arokiaselvan was new to the United States and needed help. Dr. Barth helped him buy a car, start a bank account, and showed him how to deal with legal issues such as visa applications. Dr. Barth drove Father Arokiaselvan to foreign embassies in Chicago to obtain travel documents for religious pilgrimages. "Out of their personal generosity, the Barths paid for and accompanied me on pilgrimages to Israel and Italy, and to visit a religious reawakening in Bosnian, Medjugoria." Father Arokiaselvan learned that the Barths financially supported other priests coming from his Order.

The generosity of Dr. Barth did not end with mere financial assistance. Father Arokiaselvan indicates that the Barths helped him move in the middle of a snowstorm. Even when working out-of-state, Dr. Barth would come home to take his wife to attend Mass at whatever parish Father Arokiaselvan was working. "He was a prayerful and thoughtful guide in my life, including giving me the right advice on more than one occasion."

Father Arokiaselvan returned to India in 2014, but returned in October, 2015, with his mother. They stayed with the Barths for four weeks.

In a thoughtful, concluding, paragraph, Father Father Arokiaselvan indicates he does not believe Dr. Barth has ever harmed anyone in his family.

9

> "I do not believe he has ever harmed or would harm a child. In 2011, after a family reunion, to the extent that the Barths were informed of allegations made at the time, they immediately came to the church to inform me (I believe it was the same day). I witnessed their bewilderment, disbelief and consternation at the time. . . . I can truthfully say that despite the presence of evil in his life, what I have seen of Dr. Barth and the life he has lived affirms his goodness, kindness, and generosity to all."

Once again, this letter reflects the true character of Dr. Timothy Paul Barth.

Father Arokiaselvan has flown into town to counsel Dr. and Mrs. Barth and to be present at sentencing.

As indicated in the Presentence Report, Dr. Barth suffers from several serious medical conditions. Attached as Exhibit E is a comprehensive description of his ailments, a list of healthcare specialty and sub-specialty facilities and providers that have treated Dr. Barth, prepared by his treating physician, Dr. Arthur Tai. Also included in Dr. Tai's report is a mortality table life expectancy.

Dr. Barth is in extremely poor health. His problems include obstructive sleep apnea, insulin controlled diabetes, and cardiovascular disease.

The sleep apnea is a serious risk factor with regard to his high blood pressure and cardiovascular heart disease. His diabetes has become progressively worse and currently requires up to 400 units of exogenous insulin daily. Dr. Tai indicates that Barth:

> "manifests all the serious complications of long-term diabetes, including: peripheral neuropathy with dense sensory losses of his feet, hands, and sexual

dysfunctions; microvascular complications of the circulatory system with present effects on his kidneys and eyes (retinal hemorrhages); and diabetic neuropathy, with chronic kidney failure, presently on the borderline of stage IV (out of V) which is the end stage failure requiring dialysis. The nephrologist considers his renal failure to be progressing consistently with aging. He has premature bilateral cataracts that will require surgery in the next five years."

Dr. Barth's cardiovascular disease is stable at present. He has had 11 years of paroxysmal atrial fibrillation and a related cerebral stroke in 2007. His left ventricle is enlarged, he has shortness of breath with minimal exertion.

In 2011, Dr. Barth sustained an intra-operative tourniquet injury to his left thigh. That has caused paralysis below the knee. The pain in the left leg requires a high dose of Gabapentin for relief. He must wear a brace to support his ankle and foot, or he will, as he has twice in the past, fall down. Dr. Tai recommends that he be housed in a handicapped shower-accessible area. He indicates that it is imperative that Dr. Barth have a left lower extremity brace for ambulation, requiring attention with regard to repair and preventative maintenance.

There are 28 specific and different medical problems contained in Dr. Tai's report. The medications required are listed as well. The mortality table gives Dr. Barth a 75-80% of living five years, a 30-35% chance of living ten years, and less than 10% beyond.

These medical issues, as well as Dr. Barth's age, justify a departure pursuant to USSG §§ 5H1.1 and 5H1.4.

11

Section 5H1.4 is often used in conjunction with 5H1.1. In fact, the policy statement of § 5H1.1 indicates that physical condition, which may be related to age, is addressed at § 5H1.4. Section 5H1.4 may be relevant "if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward." Certainly, Dr. Barth's medical problems are present to an unusual degree. They are extremely serious. They justify not only a downward departure from the appropriate guidelines, but a recommendation to a facility capable of dealing with these medical issues.

The final attachments, Exhibit F, are letters from Dr. Barth and Bona Barth. In his letter, Dr. Barth relates some personal history, accepts full responsibility for his actions, and offers an explanation, but not excuses, for his wrongful conduct.

The letter written by Bona Barth details her history with Dr. Barth, the problems entailed by his conduct and this prosecution, and also provides insights into his true character.

Other factors included in 18 USC § 3553 include the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. There is also a need to afford adequate deterrence and to protect the public from further crimes of the Defendant.

At Dr. Barth's age and with his physical infirmities, five years is a lengthy prison sentence. It is adequate but no more than necessary to accomplish all of the factors set

forth above. Further, controls can be placed on Dr. Barth upon his release to insure that no one else is ever victimized by Dr. Barth's conduct.

Dr. Barth does not need education or vocational training, but does require medical care.

This Court has many options in sentencing Dr. Barth. The Court is urged to reject the attempt to enhance the guidelines and determine that the proper guidelines to be used are those advanced by the defense, 97-121 months.

Dr. Barth, through his counsel, urges this Court to consider departing to the mandatory minimum in this case, 60 months. For all of the reasons set forth in this Sentencing Memorandum, that departure is appropriate.

The psychological reasons for Dr. Barth's interest in child pornography are a result, in large part, of his being serially raped while incarcerated as a juvenile. He has struggled with these demons his entire life. Throughout his life, however, those problems never manifested themselves in any way other than in viewing child pornography. He has lived a relatively crime-free life, has been a generous husband, father, and uncle to the extended family of his wife. He has provided financial, emotional, and spiritual assistance through his church and otherwise. While Dr. Barth has made many mistakes in his life, he also enjoys a loving and devoted wife and the friendship as well as admiration of persons whom the Court may rightfully assume have a good deal of experience in judging a person's character, such as Father Arokiaselvan.

Dr. Barth wants nothing more than to serve his sentence and return to his wife to spend their remaining days together in peaceful retirement. Five years puts Dr. Barth in a statistical category where his life may be extremely short-lived. On behalf of Bona

Barth, and all of those who love Timothy Paul Barth, I have been asked to express a strong desire that this Court not allow Dr. Barth to die in prison.

For all of these reasons, Defendant Timothy Paul Barth respectfully prays this Honorable Court sentence him to 60 months incarceration.

                                Respectfully submitted,

                                */s/ David S. Steingold*
                                LAW OFFICES OF DAVID S. STEINGOLD
                                BY: DAVID S. STEINGOLD (P 29752)
                                Counsel for Defendant
                                400 Monroe Street, Ste. 280
                                Detroit, MI 48226
                                (313) 962-0000 (phone)
                                (313) 962-0766 (fax)

Dated: July 21, 2017

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TIMOTHY BARTH,

        Defendant
_____/

Case No. 16-20831

Hon. Victoria A. Roberts

| | |
|---|---|
| Sara D. Woodward (P73784)<br>Deputy Chief, General Crimes Unit<br>United States Attrorneys Office<br>211 W. Fort Street, Suite 2001<br>Detroit, Michigan 48226<br>313.226.9180<br>sara.woodward@usdog.gov | David S. Steingold (P29752)<br>Law Offices of David S. Steingold, PLLC<br>400 Monroe Street, Suite 280<br>Detroit, Michigan 48226<br>313.962.0000<br>detroitdefender@yahoo.com |

## CERTIFICATE OF SERVICE

    David S. Steingold (P29752) hereby certifies that on July 21, 2017, I electronically filed the above-annexed pleading with the United States District Court for the Eastern District of Michigan using the ECF/CM electronic filing system which will automatically send electronic notification of this filing to all attorneys of record for all parties.

                              Respectfully submitted,

                              **/s/ David S. Steingold**
                              LAW OFFICES OF DAVID STEINGOLD, PLLC
                              BY: DAVID STEINGOLD (P29752)
                              Attorney for Defendant
                              400 Monroe Street, Ste. 280
                              Detroit, MI 48226
                              (313) 962-0000 (phone)