EXHIBIT C

Heidi Barin, O.D.
7314 Raton St.
Houston, TX 77055

U.S. District Court Judge Victoria A. Roberts
Theodore Levin U.S. Court House
231 W. Lafayette Blvd. , Rm #211

April 4, 2017

Your Honor:

Re: Timothy Paul Barth, M.D.

My name is Heidi Barin. I am the niece of Dr. and Mrs. Barth. Their familial name is Uncle Paul (his middle name) and Tita Bona.  My father and Tita Bona are siblings. They have been involved in my life since early childhood and are my godparents.

I am writing this letter after a call from a Homeland Security investigator. He informed me of Uncle Paul's legal issues and stated that certain family members have suggested I may be a victim of sexual abuse. The investigator referenced an allegation made by a cousin at a family reunion in 2011. I did not attend that reunion (although my father and brother did). I do not know the details of the event, but reports came to my attention afterwards. My response to any questions since has always been the same: Uncle Paul was appropriate, helpful, and generous towards me growing up. After discussing with my Tita regarding the investigator's call, she asked I write this letter. This letter is a testament to the character of the Timothy Paul Barth I knew.

I cannot vouch for every moment of my Uncle Paul's life. However, from a young age I had frequent contact and was present on many occasions when my aunt and uncle were with our large, extended family. During Christmas 1990 and 1991, the Barth's (along with other family members from various states) visited us in Texas. Years later, my brother (2 years younger) and I lived in Cincinnati with two cousins (he is a few years older and she is nine months younger than I) and their parents for roughly two years. My father was in the Philippines at that time. The Barth's paid for us to attend a Catholic school in Cincinnati. I was in 5th and 6th grade at the time I attended St. James. During that time, when the Barth's visited Cincinnati or we them, which was frequent, I was there. There were family reunions and other family events in between when the Barth's would be in attendance.

Growing up as a first-generation college graduate, I was blessed to have the support and encouragement of several family members, this includes Tita Bona and Uncle Paul. I have always wanted to be a doctor, so naturally, Uncle Paul (Dr. Timothy Paul Barth) was a role model. I remember Uncle Paul as a hard worker, an introvert, somewhat shy, but kind to all our family members. He and my Tita were looked upon as leaders of the family, especially after the early death of my grandparents. Though I do not have concrete evidence, I am sure many family members sought their assistance and advice on several occasions. They were kind, generous and helpful to all. As you will find, we have a huge family that consists of at least twenty aunts and uncles and thirty plus first cousins.

My brother and I were raised by our single father. The importance of education was instilled in me at a very young age. This was embedded mostly because my father and many of my aunts and uncles did not

want us to experience the hardships my father went through. I was a child of divorced parents, raised by a single parent, however I was nothing short of fortunate due to my extended family. Though the high school years seemed easy for me, I was thought as the "troublemaker" of the family. Sometime during my senior year, I began email correspondence with my Uncle Paul. As a medical doctor, he supported and encouraged my dreams. It was then I decided I wanted to become an eye doctor, specifically an optometrist. I graduated high school with honors and was accepted into a prestigious private college in Houston. I was given a partial scholarship. Though I do not recall the exact details, my Uncle and Tita began financially helping me through my attendance at University of St. Thomas. They encouraged my desire to attend a Catholic, liberal arts college for my pre-professional, undergraduate education. They supported me with a stipend to cover room and board biweekly. For my personal unrelated reasons, I only allowed this to continue until my junior year in college. Their generosity did not seem unusual to me as I believe they have helped other cousins throughout their college education.

Uncle Paul has always treated me with kindness, respect and generosity. I never had an encounter with him that was age or relationship inappropriate. He was extremely encouraging and hopeful in my success to become the first doctor amongst my cousins. Tita and Uncle were also religious people, especially my Tita. In fact, one of the conditions for financial support during college was that I attend mass every Sunday. (During most of my childhood, I would recite the rosary nightly with my grandparents or aunts).

I am saddened and disappointed to hear of my Uncle Paul's current legal situation. The charges against him are troubling. Being part of a large family, with many cousins close to my age, I have no recollection of my cousins or family members saying anything different to me. Of course, I was not always there and cannot know this with certainty. After my father returned from the Philippines in 1996, my brother and I moved to Texas with him and have lived here since.

I am aware that Uncle Paul has had some personal and health problems in the recent years. This may have resulted in poor judgement on his part. Though this is not a justification, I may never understand how he found himself in this predicament. Surely, this has caused my Tita and Uncle considerable embarrassment. It has definitely made an impact on what was a very close knit family. Mostly, I am concerned for my Tita who depends greatly on Uncle Paul. He has been her provider, even for the little things like driving.

I hope this has allowed some insight into the character and understanding of Uncle Paul. I appreciate your reading this letter. I ask the Court to consider Timothy Paul Barth's history of positive and beneficial influence on the many family members who have experienced him. Thank you again for your consideration.

Sincerely,

Heidi Barin, O.D.

EXHIBIT D



2:16-cr-20881-VAR-MKM Doc # 52 Filed 06/21/18 Pg 5 of 11 Pg ID 614

# ST. XAVIER'S CHURCH

Saveriyar Nagar, Pandian Nagar,
VIRUDHUNAGAR - 626 001.

**PARISH PRIEST**

Date :

RE: Timothy P. Barth, M.D.

To

May 20, 2017

        Mr. Steingold

Your Honor:

I am writing this letter in support of Dr. Timothy Barth. I have come to know and love Dr. Barth over the past eight years. My personal and spiritual development, ministry and family have been greatly blessed by his commitment to our Lord and his personal support and generosity toward his church and its clergy.

I belong to the Missionaries of St. Francis de Sales, provinced in India. I was assigned to the Diocese of Lansing in the United States as a mission field in the fall of 2007. I met Dr. Barth and his wife in late 2007, during a temporary assignment to their parish church in Ann Arbor. Because of her daily presence and volunteer activities in the church, I became friends with Mrs. Barth. I subsequently met her husband, who actively participated and supported her in her church work. I decided to become more familiar with the Barths, and after much prayer and discussing this matter with them, I informally adopted them as my surrogate parents in the United States. They quickly incorporated me into their family life and activities. I met their son and his family including their recently born first granddaughter, and many of Mrs. Barth's family of origin: brothers, sisters, nephews, nieces and in-laws in Detroit, Cincinnati and Chicago.

My appreciation of Dr. Barth developed because of his generous, fatherly, and solicitous involvement in my life. I grew up in poverty in rural India. My own father was proud of my educational accomplishments and my seminary acceptance, but he died before my ordination. When I came to the United States, I was completely out of my element. Dr. Barth, from the start, patiently showed and educated me in the ways of the United States and into the community I had entered. He helped me buy a car and negotiated a favorable price for me and my order. He helped me start a bank account, a credit card account and credit record. I developed confidence as he handled and showed me how to deal with legal issues, such as government visa applications. He accompanied me to foreign embassies in Chicago to obtain the proper travel documents to enter the Holy Land, Italy, Croatia and Bosnia-Herzegovina. Out of their personal generosity, the Barths paid for and accompanied me on pilgrimages to Israel and Italy, and to visit a religious reawakening in Bosnian, Medjugoria. I later learned that their welcoming, financial and personal support not only extended to me but many different visiting priests who came to our parish, including brother priests from my order.

I spent almost seven years in the Diocese of Lansing before returning to India. The Barths and their family followed me and supported me at my different sites, even helping me move once in the middle of a snow storm. Since Dr. Barth does all the driving, even when working out of state, he would come home to take his wife to attend mass wherever I was. He was a prayerful and thoughtful guide in my life, including giving me the right advice on more than one occasion.

*"I am nothing, if not human"* - SFS

Phone    : 04562 - 265555  Email : stxavierchurchvirudhunagar@gmail.com

Website  : http : // www.stxavierchurchvirudhunagar.in



# ST. XAVIER'S CHURCH

Saveriyar Nagar, Pandian Nagar,
VIRUDHUNAGAR - 626 001.

**PARISH PRIEST**

Date :

I returned to India in the summer of 2014. In October 2015, I returned to the United States with my mother to introduce her to the people who had been so instrumental in my success on missionary assignment in the United States. The couple I asked to pick us up and with whom we initially stayed were the Barths. We used their home as our base of operation during our four week stay. As always, the Barths were generous and supportive of us throughout our stay.

I am aware of the charges against Dr. Barth, and, although shocked, horrified and disappointed, I can truthfully say that whatever role this sinfulness played in his thoughts, it did not manifest itself in his family, private or public life to which I was exposed. I baptized both of his granddaughters and witnessed his interactions with them on multiple family occasions. I also witnessed his interactions with his wife's family members including his nephews and nieces. I was never Dr. Barth's confessor, but I know he went to confession regularly. He went to mass daily with his wife whenever he was in Ann Arbor. I do believe Dr. Barth has never harmed anyone in his family. I do not believe he has ever harmed or would harm a child. In 2011 after a family reunion, to the extent that the Barths were informed of allegations made at the time, they immediately came to the church to inform me (I believe it was the same day.) I witnessed their bewilderment, disbelief and consternation at the time. They also discussed with me as to how they might help the family members in the situation including the source of the allegation. Dr. Barth has always been kind, thoughtful, gentle and generous to all those around him. I can truthfully say that despite the presence of evil in his life, what I have seen of Dr. Barth and the life he has lived affirms his goodness, kindness and generosity to all.

Thank you for reading this letter and taking my witness and thoughts into consideration. I hope that they will be taken into account with a merciful sentence. I consider Dr. Barth a spiritual and personal "father" to me still, including in these difficult circumstances. Thank you again.

Prayerfully,
Father N. Arokiaselvam, MSFS"

PARISH PRIEST
**St. XAVIER CHURCH**
Saveriyar Nagar, Pandian Nagar,
VIRUDHUNAGAR - 626001.

---

*"I am nothing, if not human"* - SFS

Phone      : 04562 - 265555   Email : stxavierchurchvirudhunagar@gmail.com
Website   : http :// www.stxavierchurchvirudhunagar.in
Facebook : http :// www.facebook.com / StXavierChurchVirudhunagar

EXHIBIT E

IHA Internal Medicine-WestArbor
4350 Jackson Rd., Ste. 200
Ann Arbor, MI 48103

U.S. District Court Judge Victoria A. Roberts
Theodore Levin U.S. Court House
231 W. Lafayette Blvd., Rm # 211                                    June 16, 2017
Detroit, MI 48226

The Honorable Judge Victoria A. Roberts:

Re: Timothy Paul Barth, M.D.

Dr. Barth has been my patient for over twenty-five years. He has multiple medical problems—
many of them behavioral in origin and chronic over time. The attached Problem List, current
Medication and Equipment needs fully characterize his medical issues. He asked that I provide
this letter to inform the court and his future physicians of his medical history and past care.

Dr. Barth is obese as the result of excessive caloric intake. In 2007 his weight fell into the
morbidly obese range. A bariatric procedure was recommended and approved last year, but is
presently delayed because of uncertain follow-up with his present legal situation. Although he
has lost weight, he continues to weigh more than 250 pounds. This circumstance will complicate
his longevity substantially, with regard to his complicated, insulin controlled diabetes. Untreated,
Dr. Barth's obstructive sleep apnea—currently treated with Continuous Positive Airway Pressure
(CPAP) since 1994—is a serious risk factor with regard to his high blood pressure and
cardiovascular heart disease. His CPAP compliance has been documented at 100 % (although not
always 100 % effective) on multiple occasions and should continue uninterrupted, indefinitely.

Dr. Barth's diabetes, diagnosed in 1993, has required insulin for control since 2005. His insulin
requirements have increased over time—currently between 300 and 400 Units of exogenous
insulin daily—as the result of acquired insulin resistance accompanying his morbid obesity. His
diabetes is managed by a U of M endocrinologist, who has prescribed multiple adjuvant diabetic
control medications. He manifests all the serious complications of long term diabetes including:
peripheral neuropathy with dense sensory losses of his feet, hands and sexual dysfunction;
microvascular complications of his circulatory system with present effects on his kidneys and
eyes (retinal hemorrhages); and diabetic nephropathy, with chronic kidney failure, presently on
the borderline of Stage IV (out of V, which is end stage failure requiring dialysis.) The
nephrologist considers his renal failure to be progressing consistent with aging. He has
premature, bilateral cataracts that will require surgery in the next five years. He is seen annually
by a podiatrist to monitor foot problems and evaluate the adequacy of his protective orthotics and
diabetic shoes. His diabetes control has varied over time but has been around a Hmg A1c of 8.

Dr. Barth's cardiovascular disease is stable at present. After eleven years of paroxysmal atrial
fibrillation and a related cerebral stroke in 2007, two electrophysiologic ablations have resulted
in sustained normal, sinus rhythm without prolonged or significant arrhythmias for the past four
years. He is not symptomatic with coronary artery disease, but his left ventricle is enlarged con-

Arthur Tai, MD to U.S. District Court Judge Victoria A. Roberts,      Re: Timothy Paul Barth, M.D.      page 2

sistent with poorly controlled high blood pressure and long standing obstructive sleep apnea. He is treated for high blood pressure and hypercholesterolemia. He is poorly conditioned and has shortness of breath with minimal exertion. He has chronic, bilateral, lower extremity swelling (edema.) Exercise initiatives have been impeded by chronic pain and exertion induced asthma.

Dr Barth has recurrent episodes of low back pain with sciatic radiation. The longest period of time and most severe pain has been over the past six months, after a back injury while incarcerated at the Midland Correctional Facility earlier this year. Although responsive in the past, weeks of physical therapy without response and an MRI showing significant lumbar/sacral spine disease (attached) with multiple disc bulges, mild to moderate spinal stenosis, and facet and sacroiliac joint arthropathy, resulted in his neurologist recommending spinal injections with a mixture of steroid and long acting, local anesthetic. This has provided some relief. Physical therapy is anticipated in the near future to augment his response. Further joint injections are likely to benefit if his pain worsens again. At present, surgery is not anticipated.

In 2011, Dr. Barth sustained an intra-operative tourniquet injury to his left thigh. He has no voluntary muscular activity or sensation (including vibration and proprioception) below the knee. He has lancinating, neurogenic pains in the left leg requiring high dose Gabapentin for relief. He has a brace, which supports his ankle and foot during ambulation. Without the brace, and absent any position sense or muscular control of his left foot, he has fallen twice in the shower in his home. It is recommended that he be housed in a handicap shower accessible area or be provided with a shower chair and grab bars. It is imperative that he have a left lower extremity brace for ambulation. This will need attention with regard to repairs and preventive maintenance.

His medical care involves multiple medical specialties. Residing in Ann Arbor facilitates his complicated care from the following health care specialty/subspecialty facilities and providers:
**Saint Joseph Mercy Health System**
Sleep Disorders Center, Parvathy Nair, MD, and Clinton A. Hart, RST, RPSGT.
**University of Michigan**
Cardiology/Stroke Clinic. James Barklow Froelich, MD;
Cardiology, Arrhythmia and Electrophysiology Clinic. Fred Morady, MD;
Metabolism, Endocrinology and Diabetes Clinic. Rodica Busui, MD;
Ophthalmology Clinic. Harjeet Kaur, MBBS; Retina Clinic. Grant Michael Comer, MD;
Nephrology Clinic. Rakesh Kilari, MBBS; Jeffrey Alan Beamish, MD.;
Orthotic, Prosthetics Clinic. Jeffrey Wensman, CPO;
Rheumatology Clinic. , MBBS; MedRehab Physical Therapy,  David Johnson, PT;
Podiatry Clinic. Crystal Murray Holmes, DPM; Bariatric Surgery Clinic, MD.
**Neurology and Chronic Pain Management**
Associates in Neurology, P.C., Farmington Hills, MI. Mitchell Elkiss, DO, FACN, neurologist;
Tri-County Pain Consultants, Novi, MI. Timothy Wright, MD, interventional anesthesiologist.

If there are further questions, contact our offices at (734) 761-2581.

Sincerely,

Arthur Tai, M.D.

Arthur Tai, MD
IHA Family & Internal Medicine - WestArbor
4350 Jackson Road, Suite 200
Ann Arbor, MI  48103
Phone: 734-761-2581
NPI: 1720090897

Arthur Tai, MD to U.S. District Court Judge Victoria A. Roberts, Re:   Timothy Paul Barth, M.D.     page 3

**Medical Problem List**

1. Morbid Obesity. Diagnosed 2007. Obesity. Diagnosed 1983.
2. Obstructive Sleep Apnea Syndrome (OSAS.) Diagnosed 1994.

3. Type II Diabetes w/ hyperglycemia. Diagnosed 1993. Insulin control since 2005. Complications of long term diabetes:
4. Marked insulin resistance requiring high dose exogenous insulin;
5. Diabetic nephropathy with late, Stage III, Chronic Renal Failure (eGFR ~ 32);
6. Peripheral neuropathy (dense) with complete sensory loss both feet;
7. Non-proliferative diabetic retinopathy, presently not significantly affecting vision;
8. Left, inferolateral, sub-retinal vitreous hemorrhage (2016) with central vision loss;
9. Presenile ocular cataracts (presently immature with minimal vision impairment.)

10. Organic Heart Disease. Diagnosed 2002.
11. Paroxysmal atrial fibrillation. Electrophysiologic ablations in 2009 and 2013.
12. Embolic left cerebral artery stroke, (June 2007.)
13. Essential Hypertension, high blood pressure. Diagnosed 2008.
14. Dyslipidemia/Hypercholesterolemia. Diagnosed 2007.
15. Non-rheumatic Aortic Valvular Stenosis without present hemodynamic significance.
16. Left ventricular hypertrophy consistent with long-standing hypertension and OSAS.
17. Chronic peripheral edema.
18. Shortness of Breath.
19. Childhood onset, exertion and cold temperature induced reactive airway disease.

20. Left, mid-thigh tourniquet palsy with below knee paralysis and dysesthesia (2011.)
21. Osteoarthritis and chronic pain of sacroiliac joints, hips and knees.
22. Chronic low back pain (multifactorial) w/ facet arthropathy and neural impingement
23. Chronic Gouty Arthritis/Chronic Hyperuricemia.
24. Gastroesophageal Reflux Disease (GERD) with chronic heartburn.
25. Chronic Vitamin D deficiency (Childhood onset with Ricketts and adult deficiency.)
26. Rosacea.
27. Seborrheic Dermatitis.

28. Surgical and Procedural History:
A. Open Reduction and Internal Fixation of Left Tibial Plateau Fracture (March 2011.) Retained metal hardware. Surgery complicated by left, mid-thigh, tourniquet palsy: distal lower extremity muscular paralysis; complete sensory loss below left knee.
B. Colonoscopy every three years since 2000 (most recent, June 2015) with removal of multiple, adenomatous polyps (precancerous growths) on each occasion.
C. Complicated Hemorrhoidectomy (April 2015).
D. Right sacroiliac joint injection, L4-5, L5-S1 bilateral facet joint injections and L2-3 epidural injection for chronic low back pain with sciatica (April, May 2017.)

Arthur Tai, MD to U.S. District Court Judge Victoria A. Roberts,  Re:     Timothy Paul Barth, M.D.          **page 4**

**Medication Sensitivities:**

Angiotensin Converting Enzyme (ACE) Inhibitors. Hypotension/Renal Injury.
Pregabalin. Lyrica. Psychiatric manifestations. Night mares/Depression.
Synthetic opiates (hydrocodone, oxycodone) Hallucinations/excessive sedation.

**Medications:**

### For Diabetes Mellitus and complications of Diabetes:

| | |
|---|---|
| Insulin Glargine (Lantus) | 100 Units subcutaneously twice daily |
| Insulin Lispro (Humalog Kwikpen) | 30-60 Units subcutaneously TID with meals |
| Liraglutide (Victoza) | 1.8 mg. subcutaneously daily |
| Empagliflozin (Jardiance)10 mg Tab | One tab (10 mg.) daily in AM |
| Metformin Hcl 500 mg Tab ER 24H | Two tabs (1,000 mg.) by mouth @ 6 PM daily |
| Gabapentin (Neurontin) 600 mg Tab | Two tabs (1,200 mg.) by mouth twice daily |
| Glucagon (Emergency Kit) 1 mg | 1 mg. subcutaneously for hypoglycemia |
| OTC Alpha Lipoid Acid 600 mg Capsule | One capsule (600 mg.) by mouth daily |

### For Hypertension, Atrial Fibrillation and Stroke:

| | |
|---|---|
| Losartan potassium 50 mg Tab | One tab (50 mg.) by mouth twice daily |
| Metoprolol succinate 50 mg Tab ER | Two tabs (100 mg.) by mouth in the AM; and One tab (50 mg.) by mouth in the PM |
| Apixaban (Eliquis) 5 mg Tab | One tab (5 mg.) by mouth twice daily |
| OTC Aspirin (Aspirin EC) 81 mg Tab DR | One tab (81 mg.) by mouth daily |
| OTC Fish Oil 1,200 mg Capsule | One capsule (1,200mg.) by mouth daily |

### For Hypercholesterolemia:

| | |
|---|---|
| Atorvastatin Calcium 80 mg Tab | One tab (80 mg.) by mouth daily @ bedtime |

### For Hyperuricemia/Chronic Gouty Arthropathy:

| | |
|---|---|
| Allopurinol 300 mg Tab | One tab (300 mg.) by mouth daily |

### For Gastroesophageal Reflux Diosease:

| | |
|---|---|
| Pantoprazole Sodium Ec 40 mg Tab | One tab (40 mg.) by mouth daily |

### For Arthritis:

| | |
|---|---|
| OTC Acetaminophen 325 mg Tab | Two tabs by mouth up to three times daily |
| OTC Glucosamine (1500mg)/Chondroitin (1200 mg) | One capsule by mouth twice daily |

### For Rosacea Vulgaris/Seborrheic Dermatitis:

| | |
|---|---|
| Doxycycline hyclate 100 mg Capsule | One capsule (100 mg.) by mouth daily |
| Ketoconazole (Nizoral) Shampoo 2% | Apply to scalp during shower every other day |

### For Vitamin D deficiency:

| | |
|---|---|
| OTC Cholecalciferol (Vitamin D3) | One capsule (2,000 Units) by mouth daily |

Arthur Tai, MD to U.S. District Court Judge Victoria A. Roberts, Re:   Timothy Paul Barth, M.D.      **page 5**

## Durable Medical Equipment, Orthoses and Supplies:

Humidified CPAP @ 17 cm of H2O pressure for Obstructive Sleep Apnea Syndrome
Current Equipment:
1.   ResMed S9 CPAP w/ ResMed H5i Humidifier. (Intake filter, Part
No. CF-36850-2 for S9. ResMed 90W AC Adapter and 24 Volt DC Output.)
2.   Respironics Comfort *Classic* Nasal Face Mask—Size, Small (No. 1007966.)
3   Respironics Deluxe Headgear (Black-4 Strap, Reference No. 1002800.)

Left lower extremity, spring-hinged, Ankle Foot Orthosis/Brace for left foot drop.

Diabetic shoes, Size 8, wide to accommodate AFO and fitted, orthotic shoe inserts.
Currently, "Dr. Comfort Shoes", Style 'Douglas', Size 8 W, with protective, accom-
modative, custom fitted insoles/inserts in right shoe and affixed to left AFO.

"Juzo'" brand, 20-30 mmHg, Silver Sole, Knee High, Vascular Compression Stockings
for chronic, lower extremity edema.

Handicap accessible shower/Shower chair and shower w/ assistive devices (grab bars.)

Cane to assist ambulation/balance.

## Mortality Table Life Expectancies (approximate)
Given current age (67 years, 6 months), following medical history and continuing
optimal control of chronic medical conditions:
Morbid obesity for more than 10 years;
Embolic cerebral artery stroke at early age, 57 years 5 months, consistent with
early onset atherosclerotic heart and vascular disease;
Type II, Diabetes for 24 years complicated by marked insulin resistance,
retinopathy, severe peripheral neuropathy and chronic renal failure
(current eGFR ~ 32) indicative of microvascular disease;
Hypertension, with continued aggressive control;
Obstructive Sleep Apnea Syndrome with continued appropriate CPAP therapy;
History of adenomatous colonic polyps.
Family History: Father died age 85. Only atherosclerotic heart disease and strokes

Life Expectancy within the next:
| | |
|---|---|
| 5 years ~ | 75 - 80 % |
| 10 years ~ | 30 - 35 % |
| 15 years ~ | 5 - 8 % |
| 20 years < | 2 % |

Major preventable risk factor: Colon Cancer with regular colonoscopy for polyps.
Major determinative risk factor: Age of onset, end stage renal disease requiring hemodi-
alysis. (If patient's chronic kidney disease progresses to kidney failure and dialysis at
any time in the next 10 years, life expectancy thereafter will be less than 5 years.)

Addenda reviewed by: _____

Arthur Tai M.D.

Arthur Tai, MD
IHA Family & Internal Medicine - WestArbor
4350 Jackson Road, Suite 200
Ann Arbor, MI 48103
Phone: 734-761-2581
NPI: 1720090897

R52



**AIN Imaging, P.C.** 734-730-7538
27555 Middlebelt Road
Farmington Hills, MI 48334
P(248)478-5512 734-994-1190
F(248)478-5350



| | | | |
|---|---|---|---|
| **Patient Name:** | TIMOTHY BARTH | **Patient ID:** | AIN39840 |
| **DOB:** | 02/10/1950 | **Physician Name:** | MITCHELL ELKISS |
| **Exam Date:** | 4/12/2017 | **Fax #:** | |

MRI LUMBAR SPINE WITHOUT CONTRAST

HISTORY: Lower back pain.

TECHNIQUE: Multiplanar, multisequence imaging of the lumbar spine was performed without contrast.

FINDINGS:
Normal vertebral body height and alignment are preserved apart from multilevel Schmorl's nodes, most prominent at T11-T12 with lesser degrees at L2-3 through L5-S1. There is predominantly Modic type 2 degenerative endplate change. There is relative preservation of disc height and hydration at T12-L1 and to a lesser extent L1-L2. The conus is normal in signal and terminates at L1.

At T11-T12, there is moderate disc bulge with relative canal stenosis and right greater than left neural foraminal narrowing, only imaged on the sagittal sequences.

At L1-L2, mild disc bulge is present. The canal and foramina are patent.

At L2-L3, mild disc bulge and moderate facet hypertrophy are present. There is mild relative canal stenosis with mild bilateral neural foraminal narrowing.

At L3-L4, there is moderate disc bulge with superimposed right paracentral disc extrusion and mild facet hypertrophy. There is prominent epidural fat with mild to moderate central canal stenosis. There is moderate right greater than left neural foraminal narrowing.

At L4-L5, moderate disc bulge and facet hypertrophy are present. There is moderate left and mild right neural foraminal narrowing. There is mild central canal stenosis. The neural foramina are patent.

At L5-S1, mild disc bulge and moderate facet hypertrophy are present. There is moderate to severe bilateral neural foraminal narrowing. There is narrowing of the lateral recesses bilaterally with mild central canal stenosis.

IMPRESSION:
Multilevel lumbar degenerative change as described.

rmt:kp

**Report typed by:**     **KP**

*called 4/13/17*
*LM mr*

*spke to pt 4/13/17*
*mr*

**MATHEW CHAKKO, MD**
**Date & Time Signed:**     4/12/2017 2:32:29 PM

---

**Examination report:**                                                                 Page: 1 of 1

EXHIBIT F

Timothy P. Barth
3265 North Wagner Road
Ann Arbor, 48103  Michigan

Victoria A. Roberts
U.S. District Court Judge
Theodore Levin U.S. Court House                    July 17, 2017
231 W. Lafayette Blvd., Rm # 211
Detroit, MI  48226

Your Honor:

**To whom much is given, of him much shall be required.**

I plead guilty to receiving child pornography. Nothing I say is offered to minimize or justify my crime. I only wish to fill in some details of my life; set the record straight and broaden the court's understanding. My motive is to neither mitigate my criminal behavior, offer excuses nor ameliorate my fault by blaming others or circumstances. Rather, I want to give an account of how I find myself in the dock facing sentencing and how my actions had far reaching punitive consequences for my family, beyond the impact of any sentence I can expect from this court.  I don't deny my culpability and hold myself completely responsible for all the evil that has entered their lives in the past eight months.

The investigation besieged and destroyed multiple families by its reckless disregard for truth, insinuations of wrongdoing without foundation, and lack of basic investigation into all of my life and the people around me. Many innocents were permanently injured including our grandchildren. I wish to take this opportunity and for the record, defend the innocent, those ignorant of my activities, and apologize for the harm and injury I caused them.

Investigation of my whole life by the prosecution appears to have discovered only two things: The first is an allegation made in 2011 about an even more remote incident in 1993?.  (The prosecution's investigative proficiency is demonstrated by their acceptance of the unverified allegation of my accuser that I am a psychiatrist. One need only Google me to determine my medical specialty as internal medicine. I have practiced adult general medicine—almost exclusively in adult prisons and jails—for forty-one years.)  Second, a computer given me as a birthday gift in 2010 and proffered to Best Buy for repairs in April 2016, was determined to contain downloaded images of child pornography starting in late 2012. That possession occasions the charge against me.

First, I am accused of a singular incident of sexual exploitation of a child to lengthen my sentence. I have never been charged with this offense. The only proof offered are the conflicting statements of a troubled, young, alcoholic woman first made in 2011 after a family reunion and again in the fall of 2016. Initially, the allegation was disbelieved by all family members including my wife and son because of her past history of lying. To convince her disbelieving

1

father, she was driven by him to Michigan to file a complaint with the Washtenaw County prosecutor's office. Finally, she repeated her allegation to a Homeland Security officer when asked as part of this investigation. In response:

I barely remember her as a child—always in Chicago—when she came to visit her grandparents, my parents-in-law. She lived with her mother, who limited family contacts and did not permit her to leave Illinois because she falsely accused her father (my wife's brother) of sexual molestation at a young age. I completely deny the event. She never visited Ann Arbor as a child. I remember no interaction with her at all. I had neither opportunity nor did I engage in any activities claimed. Neither my nor any of the witnesses supposedly present, including two registered nurses and two other medical professionals, remember her in Michigan before her late teens or recollect any incidents as described. Later, in her twenties, when she repeatedly asked my wife and me to take her 5-year-old daughter into our home and raise her, my only involvement was to support my wife's insistence that both she and her child should come live with us.

The crime to which I plead guilty started at age twelve. At that time I experienced three weeks of unspeakable violence that has colored my whole life up until the present day. This happened in a large, urban, juvenile detention facility, where, after an arrest for shop lifting, I refused to give my name, age or other information. I was small but appeared older than my actual age and housed with older boys. I was repeatedly raped and involuntarily forced to participate in sexual acts on a daily basis. The pain, anger, humiliation, shame, self-doubt and self-hatred have impacted almost all of my adult life. It is only through recent psychotherapy that I realized—for forty years of professional life, during which I daily walked into jails and prisons—my unconscious motives and plan was to somehow undo and change the outcome of this childhood, powerlessness and trauma.

I assure the court: both my wife and son had no knowledge of my interest in, viewing of, or down loading of pornographic images. They were unaware, during the long months I was out of state working for the Bureau of Prisons in West Virginia penitentiaries (11 months) or in the prisons of Indiana (23 months), that I downloaded pornography of any sort. This included child pornography after it started popping up on my computer in late 2012. For whatever reason, some images reminded me of the soul-deadening, sadness and loneliness I experienced as a child; of what was stolen and lost during my nights in the dormitory. Somehow, as I grew older and experienced the complications of chronic diabetes and aging, I could no longer repress the conflicts and questions in my life; how my life seemed to be repeating itself in my isolation and work. I can truthfully say, and this is supported by the prosecution's forensic investigation, I never looked for any of these pictures, contacted or solicited anyone to provide pictures or shared pictures with others.

My wife is asian in heritage and oriental in culture and identity. She is not individualistic as people who grow up in traditional American society are. She identifies herself as part of a family and community. The investigation on multiple fronts has stripped and isolated her from outside sources of support and identity, not in small part based on rumors or outright untruths. My wife is retired, University of Michigan, nursing school faculty. We have lived in Ann Arbor 35 years.

page 3

She cannot go anywhere without running into people who know her. They no longer acknowledge or respond to her when greeted. They look askance and avoid eye contact. The unpleasant, family reunion incident with recent, persistent questioning by the investigator and his child pornography statements has incited much family rancor, and the family have all but abandoned my wife for her support of me. She has even been isolated in her church activities, where she participates in the daily mass as a sacristan and eucharistic minister.

Further great harm was done to our daughter-in-law. She reports that the Homeland Security investigator on the Friday before Christmas, called her at the Michigan Attorney Generals' office —where she is an Assistant Attorney General—and informed her that my wife and our son knew about the child pornography and that there were " pornographic images" of her daughters—our granddaughters—on my wife's computer. The actual "images" on my wife's computer were photographs taken by my son and daughter-in-law and shared with my wife. None were remotely pornographic or "prepornographic". There never were child pornographic images on my wife's computer. nor were any found on the hard drive. My granddaughters' pictures are described by the prosecution as "unusable", although not by the investigator in his representations. As a result, my daughter-in-law left my son, has denied him access to their children, and threatened an ethics investigation into his knowledge of my activities and my wife's insinuated collusion. My son has been denied contact with his children, he has not visited our home since my daughter-in-law left and my wife no longer has a son or grandchildren.

I apologize to my wife of 36 years. I am deeply sorry for the injuries and harm I caused you, our son, our grandchildren and the rest of your family. I hope that in the future your son, the only daughter you have ever known (our daughter-in-law,) your grandchildren and the rest of your family are restored to you. I know you are losing me and hope to live long enough to return to you, if it is still your wish. I thank you for your extraordinary loyalty. I am also aware that your retirement savings have been stolen by my actions as legal fees, fines and charges are levied on what was planned for our mutual comfort. The continuing humiliation, deep shame, isolation from community, church, family and friends, helplessness and hopelessness I caused you by my actions are the source of my greatest remorse. I truly realize that it is the innocent, both present today and remotely past, my family and the subjects of sexual exploitation included in the downloaded pictures, that have suffered the most by my actions. I am sorry for my actions to all.

The irony of facing incarceration at age 67 and possibly dying in prison—a fear that has never quite left me in 55 years—makes my pain and anxiety complete. Yet I understand the law and your judicial responsibility and will comply with the sentence proffered as just, merciful and required recompense for my offense.

Thank you for your time and consideration of these matters.

Respectfully submitted,

Timothy P. Barth

Bona M. Barth, BSN, RN
3265 North Wagner Road
Ann Arbor, 48103  Michigan

Victoria A. Roberts
U.S. District Court Judge,
Theodore Levin U.S. Court House          July 17, 2017
231 W. Lafayette Blvd., Rm # 211
Detroit, MI  48226

Your Honor:

I am devastated by my current family circumstances. My son has not visited our home since
before Christmas. Neither I nor my son have seen or heard from his children, my grandchildren,
since early January. My daughter-in-law claims that a Homeland Security investigator informed
her that "pornographic" pictures of her children were found on "my" home computer—as
opposed to my husband's computer, which is another matter. To my knowledge the only pictures
of children I had on my computer were of my grandchildren and sent to me by my son and
daughter-in-law. I have heard in court of "a mass deletion," but, although my husband
occasionally used my computer for work or taxes, I never noticed any pornographic images of
any sort on my computer. I have been told that deleted substance is retained on the hard drive
unless overwritten. This content has been characterized by the prosecution as "unusable" in
court. I assume they mean "not pornography" but the insinuation is still my complicity.

I now face the imminent incarceration of my husband and do not know if I will ever see him
alive again. I do not drive on expressways and do not travel without him. If incarcerated at any
other site than Milan, I will not be able to see him until after his release from prison. My life
seems to have ended because of his stupid, selfish and perverted behavior. I expected protection
from this man and that is the last thing he can offer me in these circumstances of his making.
Yes, I am angry at him and condemn him for his senseless, thoughtless engagement in activities
that he knew was wrong. In my pain and anger I have wished him dead on countless occasions
and perhaps have been a little too free in acknowledging this fact to him. The pain caused by his
betrayal of me, my son and our family are sometimes more than I can bear.

Despite this cascade of negative feelings, I am asking you to not take my husband away from us.
I am asking for mercy in your considerations for sentencing. In the more than than 37 years we
have known each other, I can't help but have learned to love him because of his overwhelming
goodness, kindness, caring, generosity and loyalty to me, my family, coworkers, patients,
acquaintances and even strangers. And, I must admit that much of his goodness (and apparently
the evil in his life) seems to have a basis in something I will never understand: the indescribable
violence he experienced as a child growing up in a family with mental illness, poverty and abuse.
I will try to be brief, but ask for your indulgence.

1

We met in 1980, after he worked for three years fulfilling a Public Health Service Scholarship medical school obligation at the MCC, New York. He was in training at the VA Hospital in Cincinnati. Tim seemed to have a talent for verbal communication with his patients and was especially good at communicating medical information and demonstrating compassion and empathy with regard to his patient's fears, difficulties and distress. Otherwise, he was quite shy when not being a physician and somewhat lacking in social skills. Since I had had a hysterectomy before we met, when the issue of children came up as we were planning marriage, he told me that he was quite happy with my son who had a father, but that he had never wanted children of his own because he lacked a positive father figure in childhood and did not think he could ever be a good father. When my first husband died shortly after our marriage, Tim admitted to a great deal of anxiety about being a father, but I said I would help him. He subsequently adopted my son and has treated him as his own. Although I know he will give all the credit to me for his good parenting, Tim has been a very good father up until recent times with these disgusting circumstances.

My husband has always been frugal with regard to his own expenses, saving for retirement from the time we first married and still a very good provider. Of course, because his income was limited to a government salary, most of the time I worked as well. He has been generous to me and our son, supporting him while paying his full tuition as an undergraduate and in law school. He has never denied me anything except the money to buy him an expensive gift. His generosity to other family members has been staggering. He has helped family members in trouble on numerous occasions. When we were planning to build our present home, my parents were in the process of retiring in Chicago. The house we built was designed by Tim to have a complete walk-out, lower level living area including a kitchen, dinette and and three bedrooms—"for visitors"—for my parents. He has helped two nieces and a nephew with their college expenses (totaling over $100,000) and, in addition, countersigned their educational loans. The first hint I had that I should be careful with his generosity was when he gave $2,000 to a co-worker to pay the bond of her 17 year-old daughter who was arrested for drug possession. He trusted her to pay us back and she did. Most recently, he paid for the treatment and root canal of his home health care assistant who developed a large dental abscess while they were working together. I have asked her to write a letter to the court but do not know if this was done.

Tim has been an outstanding friend to me over the years. He has always listened carefully, absorbed my frustrations, and been supportive in all kinds of ways one expects from a best friend. I have had numerous friendships, men and women, with co-workers, people I know from church and other activities in my life. But with rare exception, Tim has been my only, true confidante. He has been steadfast in his support of me with my parents, their final illnesses and deaths. He visited my mother daily in the hospital during her multiple cancer-related hospitalization in the last three months of her life. I lost a brother before age 40 to renal cancer and a sister three weeks later to an automobile accident. As I have had occasional employment woes he stood behind me and reinforced my self-confidence. Unlike other men, however, Tim has never had a friendship with men or another man in the whole time I have known him. In family gatherings, he always sits with me and my sisters. My brothers and bothers-in-law used to be polite and invite him to join them in their activities but he always declined. He does mention one male friend from college, who was murdered when he was in medical school, but when

asked why he has never done things with other guys or had male friends, he has always stated that he doesn't trust other men and he avoids socializing with them. With the one exception above, Tim has always said that his friends "since high school" have always been women. He gave up these friends for me.

I have always known my husband to be a deeply religious man. He converted to Catholicism before I met him. After we were married, he was the one who encouraged me to return to church. He gave me my first Bible for reading and shared his knowledge as I read it cover to cover. He was excited when I decided     to do graduate work in pastoral counseling and helped me write my papers. He has supported my activities in the church and generously supported the church and other religious charities with me. When home and not working, he goes to mass daily with me. He has been supportive of my activities with the clergy and when a missionary priest from India became involved in our lives, Tim was quite fatherly in his involvement. The biggest thing he seems to have missed during the past eight months was going to daily, early morning mass.

His religious interests have deeply affected his professional life. He has worked in prisons and jails 38 of his 41 years as a physician. For years I suggested that he find more prestigious work as a physician—after all he was smart enough and we lived in a physician's ghetto in Ann Arbor. However, he reminded me that our Savior had specifically addressed being visited in prison by his followers (Mathew 25:35-40) and he said he was going to see Jesus every day. He developed a reputation with his patients for his dedicated caring and was directly instrumental in managing the serious and terminal illnesses of numerous AIDS patients during that period of time when so many died in the 1980's and early 1990's. Tim has frequently reminded me of "to whom much is given, much shall be required." He would vaguely discuss a period in time "when [he] was a kid" when he had almost died. He seemed to believe he was spared for some purpose and therefore he should do something good that would make a difference. He spent most of his adult life helping other people and serving with distinction the government law enforcement agencies for which he worked. In the meantime, I noticed that occasionally he would have violent nightmares and disturbed sleep. This decreased after the first ten years of our marriage and has only recently returned to our lives over the past four years.

Recently, because of all this perversion and my need for answers, my husband has finally explained a few things to me. He reports that most of this has come to consciousness during therapy. Some details he still "can't share", but this he how I understand it. After retiring from the Wayne County Jails and traveling for a few months on religious pilgrimages, Tim returned to work as an itinerant physician. In order to continue working in prisons, he travelled some great distances and ended up quite isolated, since prisons are generally not in the geographically most desirable places. He had his laptop with him and he began to look at pornography when he was not at work. In late 2012, child pornography websites popped up on his computer. He tells me that if I had ever looked at the images he downloaded, I would have been struck by the almost exclusively sad-faced girls he collected. In fact, it was the facial expressions that led him to start downloading images. For unclear reasons, he would identify with these little girls and it seemed to draw a sadness out of him that he had been experiencing on and off, since his father's death in 2005. The loss of innocence reminded him of something that was returning to his memory from when he was in a juvenile detention center for three weeks at age twelve.

I cannot lose my husband. I still do not believe that my husband could ever or has harmed anyone, especially a child. He is and has always been extremely protective of children. He has childhood memories that he cannot exorcise and he would never inflict something similar upon a child. He identifies very closely with these victims in a viscerally personal way. Unfortunately, considering the nature of his activities, I, my son and his children—our grandchildren, who despite forensic questioning have made no allegation against their grandfather—are the visible and present victims of his crimes. I as their representative stand before this court, asking for mercy. Do not add to our victimization by taking away my husband, a father and grandfather.

With gratitude and sincerest respect,

*Bona M. Barth*

Bona M. Barth