### UNITED STATES v. TIMOTHY PAUL BARTH

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA,

 6              Plaintiff,              Case No.  16-20831

 7      -vs-

 8                                      Detroit, Michigan

 9   TIMOTHY PAUL BARTH,                August 22, 2017

10              Defendant.

11   ----------------------------/

12              TRANSCRIPT OF SENTENCE HEARING

13         BEFORE THE HONORABLE VICTORIA A. ROBERTS

14           UNITED STATES DISTRICT COURT JUDGE

15

16   APPEARANCES:

17   For the Government:        Sara D. Woodward
                                United States Attorney's Office, General Crimes
18                              211 W. Fort, Ste 2001
                                Detroit, MI 48226
19

20   For the Defendant:         David S. Steingold
                                Law Offices of David S. Steingold PLLC
21                              400 Monroe Street, Suite 280
                                Detroit, MI 48226
22

23

24   Proceedings taken by mechanical stenography, transcript
     produced by computer-aided transcription
25
```

UNITED STATES v. TIMOTHY PAUL BARTH

1                    **T A B L E   O F   C O N T E N T S**

2

3    <u>**WITNESSES:**</u>                                    **PAGE**

4

5

6    <u>**CHRISTINE BARIN (Government)**</u>

7          Examination by the Court              18

8          Examination by Ms. Woodward           20

9

10

11   <u>**BONA MATTSCHECK BARTH (Defense)**</u>

12         Examination by Mr. Steingold          23

13         Examination by Ms. Woodward           27

14

15

16                      **E X H I B I T S**

17

18   <u>**NUMBER**</u>            <u>**IDENTIFICATION**</u>            <u>**RECEIVED**</u>

19

20   None.

21

22

23

24

25

1                        **Detroit, Michigan**

2                   **Tuesday, August 22, 2017**

3                    **(At about 11:25 a.m.)**

4                           **- - -**

5                  **(Call to Order of the Court)**

6            THE CLERK OF THE COURT:  The Court calls the case of

7    United States of America versus Timothy Paul Barth, case number

8    16-20831.  Counsel, please state your appearances for the

9    record.

10           MS. WOODWARD: Good morning, Your Honor.  Sara

11   Woodward on behalf of the United States.  With me at counsel

12   table is Special Agent Jay Ratermann with the Department of

13   Homeland Security.

14           THE COURT: Thank you.

15           MR. STEINGOLD:  Good morning, Your Honor.  David

16   Steingold for Dr. Timothy Paul Barth who's present to my right.

17           THE COURT: Thank you.  You can take your seats.

18        This is the time the Court has set to impose sentence on

19   Mr. Barth.  He pled guilty to Count One of the Indictment

20   against him that charges him with Receipt of Child Pornography

21   in violation of 18 U.S. Code 2252(a)(A)(2) and 2252(a)(B)(1).

22        I have -- I just want to say what I have here before I get

23   underway.  I have the Presentence Investigation Report prepared

24   by Lee Sharp and he is here.  I have a Sentencing Memorandum

25   filed by both Mr. Steingold and Miss Woodward, and a number of

1    exhibits attached to both of the Sentencing Memoranda.  I have

2    an unopposed Motion to Amend the Stipulated Order of Forfeiture

3    and I have a letter that is signed by Christine Denise Barin.

4    Is Miss Barin here today?

5              MS. WOODWARD: She is, Your Honor.

6              THE COURT: She is?  And is it her intention to speak?

7              MS. WOODWARD: I don't believe so, but I was going to

8    confirm that you had received her letter and let you know that

9    she is present.

10             THE COURT: I do have the letter, and she would be who

11   is identified in documents as C.B.?

12             MS. WOODWARD: That's correct.

13             THE COURT: Thank you.  So did I say everything I

14   should have in front of me for purposes of this sentencing,

15   Counsel?  Miss Woodward?

16             MS. WOODWARD: Yes, Your Honor.

17             THE COURT: Mr. Steingold?

18             MR. STEINGOLD:  Yes, Your Honor, I believe so.

19             THE COURT: Thank you.  So, Mr. Steingold, there are a

20   number of objections you have to the Presentence Investigation

21   Report.  I think most of them are tied to whether the Court is

22   going to add the five-point enhancement under 2G2.2(b)(5); is

23   that an accurate statement?

24             MR. STEINGOLD:  That is an accurate statement.

25   There's one exception of course and that is kind of related and

**UNITED STATES v. TIMOTHY PAUL BARTH**

1    that's my personal belief that my Objection Number Five that

2    Mr. Sharp shouldn't weigh in on the matter, that that usurps

3    the function of the Court, but again, that's all tied to the

4    requested additional five points to the Guidelines.

5             THE COURT: All right.  I'll hear from you if you have

6    something to add to your objections.

7             MR. STEINGOLD:  Your Honor --

8             THE COURT: Mr. Steingold, I have a request for you to

9    speak louder.

10            MR. STEINGOLD:  Your Honor, I will.  I'm somewhat

11   taken aback because I had no idea that Christine Barin was

12   going to be present.  I did not know whether the letter I

13   received a copy of yesterday was signed because the copy of it

14   I had was not signed.  I didn't know whether the Court was

15   going to conduct some sort of evidentiary hearing.  I know that

16   if the Court were to entertain such a hearing, my client's wife

17   would like to be heard, but what I wanted to say is really

18   about the entirety of these allegations, and it's a very

19   difficult situation for me because the burden for the

20   Government is to show by a preponderance that this is an

21   applicable addition.

22       In a preponderance of the evidence we know -- with the

23   Court I certainly don't have to tell the Court -- that it's a

24   civil standard and it's usually based on properly admitted

25   evidence, and the Trier of Fact would have to decide after

1  hearing all the properly admitted evidence whether or not it's

2  been proven by a preponderance.  But of course we know in this

3  situation, not only is it a preponderance, but the Court is

4  allowed to consider what would otherwise be inadmissible

5  hearsay and evidence that would not typically be received in

6  court.

7           THE COURT: You said that I can rely upon that?

8           MR. STEINGOLD:  You can, yes.  You can, but it makes

9  it difficult to argue against a preponderance when we're

10  dealing with -- in some instances in particular when we're

11  talking about the comments of the male cousin whose initials I

12  think are K.Z., we're talking about triple hearsay.  We're

13  talking about things that allegedly Christine Barin told to him

14  that he told to the Agent, that the Agent summarized in a

15  report.  So it's very difficult because it's hard to tell where

16  the facts began.

17      We have what I thought was an unsigned letter; apparently

18  it's signed.

19           THE COURT: I have -- it's typed. There's no signature

20  on it, but it has -- her name is on it and she did speak

21  directly to police officers in 2011.

22           MR. STEINGOLD:  Well, that's when she made a report

23  in 2011, some 20 years after she claimed this -- these events

24  occurred, but there are things that it occurred to me would

25  have been addressed right from the get/go right when these

1   allegations first were brought up when we were having a

2   detention hearing before Magistrate Patti and eventually was

3   repeated in front of this Court.

4       My client, in particular his wife, alleged a couple of

5   things.  Number one is that Christine Barin had previously made

6   a false allegation of sexual charges against her father, and

7   also that Christine Barin had asked my client and his wife to

8   raise her child, something at odds with the notion that my

9   client would have molested her at an age somewhat similar to

10  the age of her child, and you would have thought that those

11  charges would have been addressed by Miss Barin in a letter, in

12  the interviews that she had with the Agent.  I want to talk a

13  second about those interviews.

14      Your Honor, I'm sorry if I get a little carried away.

15  This is very emotional for my client as for me, and I'm a

16  little bit frustrated about the continued allegations without

17  any sort of corroboration or proof and a perfect example I

18  believe is the fact that we have these reports by the Agent who

19  makes it very clear in the beginning of his reports that these

20  are summaries; that there are video and audios of these

21  interviews and that in fact this is just his summary of it, and

22  there's a lot of deletions in the summary.  Perhaps the Court

23  doesn't have the same deletions I do and I'm not talking about

24  the names.  We know who the names are.  They can delete them,

25  but that's not keeping us from knowing what the substance of

1    the report is, but there are huge blocks of deleted information

2    and I don't understand why at some point those interview videos

3    and audios weren't made available to the Court for it to

4    properly assess as best it can given the circumstances, the

5    credibility of the person speaking because they're asking you

6    to make a determination based on a summary given in some

7    instances of double and triple hearsay.  When I say double and

8    triple, I'm talking about the two other cousins that are not

9    here. I'm talking about K.Z. and J.C. J.C, I think he signed a

10   letter.  Am I allowed to use his name since he signed the

11   letter?  I don't know, but you know who I'm talking about.

12           THE COURT: I do, yes.

13           MR. STEINGOLD:  So this is a problem for me because

14   we have these reports and that's all we have.  They don't

15   address, as I said, the significant allegation that they asked

16   my client and his wife to raise the child.

17       We have the triple hearsay.  We have nothing signed by

18   K.Z.  We have nothing to suggest why he would claim that he was

19   told by Christine Barin that she was molested when she was four

20   years old, and Christine Barin claims it was when she was 10

21   years old.  There's been no resolution of that significant

22   conflict in what Christine Barin claims happened and what K.Z.

23   claims Christine Barin told him.  We have -- I said K.Z; I

24   meant J.C. and that's why I'd rather use their names because

25   I'm going to confuse J.C. who's the male cousin with K.Z.,

1    which is the female cousin who again has not come forward,

2    refuses to make a statement, refuses to confirm anything even

3    to the Agent and we're left with nothing more than J.C., the

4    male cousin, claiming that K.Z. told her these things and J.C.

5    isn't here for us to find out when she said that, under what

6    circumstances, who else was there, why she never -- why she

7    never, why K.Z. never, J.C. never and why C.B. never reported

8    it to anyone for 20 years, except allegedly talking about it

9    amongst themselves -- until 2011 when we're told and we know

10   that Christine Barin came up with her father and made a report

11   to the Washtenaw County Prosecutor's Office or the Sheriff's

12   Department.  Why they waited 20 years has not been resolved.

13        THE COURT:  Well, Mr. Steingold, I understand that

14   you would be very much opposed to the Court adding in these

15   five extra points that will so dramatically affect your

16   client's sentence, but we have time and time and time and time

17   again in very public headlines seeing victims of sexual abuse

18   come forward 10, 20, 30, 40 years later and I don't think all

19   those women are lacking in credibility.

20        MR. STEINGOLD:  I don't think so either, but I think

21   you have to look at the specifics of each case and in this case

22   in a family situation with the allegations that have been made

23   and the very strong likelihood that some of these could be

24   corroborated, you have as opposed to these mere allegations,

25   you don't have anything signed by K.Z. We have nothing signed

1   by J.C. We have absolutely nothing but double and triple

2   hearsay from them.  We do have Christine Barin's statement and

3   also we have Heidi Barin's statement and I think that's

4   significant.

5       Heidi Barin is a doctor.  I know the Court has read

6   through the letter that she wrote and it is significant because

7   this is a woman who Christine Barin and the other cousins

8   claims was molested as well, and I know the Court read the

9   letter and if I were to put pen to paper and try to write as

10  good a letter as I could on my client's behalf, I couldn't do

11  better than what Heidi Barin wrote, and she made it very clear

12  that there was never any hint of impropriety, that my client

13  always treated her appropriately, age-wise and otherwise and

14  that he's been an inspiration to her and has been the reason

15  both financial, emotional and otherwise for her achieving the

16  success that she has and completely refutes the notion that my

17  client has any tendency towards child abuse.  Now this is a

18  woman who put her name on paper and was ready to come forward,

19  who's willing to talk to anybody, and I think that's important

20  because you can judge somebody's credibility if they're willing

21  to come forward.  We don't know anything about K.Z. except that

22  she's refused to make a claim. She has not told anyone

23  allegedly except for her cousins, that she has been abused.

24  She certainly never said anything to the Agent who tried on at

25  least one and I believe more than one occasion to attempt to

1    get her to make a statement. There's no reason why she wouldn't

2    have told her parents or anyone else if she would have told

3    C.B. and there's nothing to suggest that she's ever made these

4    allegations.  Heidi Barin I think is important.

5         Father Arokiaselvan I think is very important.  The Court

6    should know he's also present in court and I'm quite certain

7    the Court has reviewed the outstanding letter that he wrote on

8    my client's behalf.  Now here's somebody who knows my client

9    better than perhaps anyone else in the courtroom except for his

10   wife.  This is someone who's lived with him.  This is someone

11   who has attested to my client's faith, devotion to the Church,

12   to charity, to his wife and to doing the right thing, and his

13   view of my client's character I think is significant and I

14   won't go over the quotes that I put in any Sentencing

15   Memorandum; I'm sure the Court has read them all.  But between

16   Heidi Barin and Father Arokiaselvan we have two people who know

17   what my client is really all about; who's not alleged to have

18   been in this at any point in their life to get money from the

19   Barths, as Christine Barin has; who never asked my client for

20   anything, let alone to allow their daughter to live with them,

21   to raise her daughter which is -- it still hasn't been

22   addressed and to me is the single most confusing thing about

23   the allegations of Christine Barin.  How could you ask the

24   person who you claim molested you as a child to raise your

25   daughter?  It's without explanation.

1       You've got the letter from Dr. O'Neill (phonetic) from the

2    Birmingham Maple Clinic who after having my client undergo a

3    complete battery -- I think it was nine tests -- says there's

4    absolutely no indication that my client has any child predator

5    symptoms or anything to indicate that he was or is a child

6    predator.

7       We have the attesting to the charity work that my client

8    has performed over the years.  We have the devotion he is to

9    the church.  We have the fact that he's been in treatment and

10   of course I haven't address his medical issues yet- we're still

11   dealing with the enhancement.

12       But, Your Honor, there's one other comment that I just

13   have to mention that somehow found its way into the

14   Government's Sentencing Memorandum and that is the claim by

15   Miss Woodward that my client used his status as a doctor to

16   gain access to C.B, and maybe she read something that I didn't

17   because every report that I've read, even those made allegedly

18   by Christine Barin was that my client didn't use his status;

19   that was the family.  In fact, Christine Barin's own parents

20   who asked my client to attend to her on the occasion when she

21   was sick back in 1991 or whenever it is.

22           THE COURT: Maybe so, but they asked him to attend to

23   her because he was a doctor.

24           MR. STEINGOLD:  But he didn't use it to gain access.

25   They asked her to treat her because she was sick.  They know

1   he's a doctor.  They make it suggest that he was saying hey,

2   I'm a doctor, let me handle it, as though he wanted to get his

3   hands on her and there's absolutely nothing to suggest that's

4   true, not even from Christine Barin.

5        Your Honor, I can't explain the 10 years old versus the

6   four years old.  I can't explain not reporting it for 20 years

7   to your own parents.  I cannot explain why they would not have

8   addressed the suggestion, the allegation that my client and his

9   wife were asked to raise the child.  I can't explain why they

10  haven't addressed the allegation that she had previously made a

11  false claim of sexual abuse against her father, but they're

12  trying to use this person who hasn't answered these to prove by

13  a preponderance that my client did something 25 years ago, and

14  it's hard to not believe that somebody who's making a statement

15  like that is telling the truth.  It's hard because it's foreign

16  to our nature.  None of us can imagine making a false claims

17  like that against someone, so you want to believe it's true,

18  but time and time again we've seen that these kinds of

19  allegations have been made and are being made for a lot of

20  reasons; sometimes monetary, sometimes for personal reasons

21  that we can't understand, but these false allegations do occur

22  and in this case we believe that it is financial and we believe

23  that Christine Barin was extremely upset that my client and his

24  wife told her no.  If you want to live here with your children,

25  that's fine, but we're not going to raise your child so that

1  you can live a single life-style that they as devout Catholics
2  believed was not appropriate, not appropriate for her, not
3  appropriate for the child and that's significant and that's a
4  motivation and that took place before the report to the
5  Washtenaw County Sheriff and that makes no sense either.  It's
6  completely inconsistent.
7      And we're talking about a preponderance of the evidence
8  and I believe that the preponderance of the evidence -- because
9  all they have is the mere allegations of Christine Barin; we
10  have nothing else.
11      They can claim that well, we've got the confirmation that
12  she talked to her cousin J.C.  But again, J.C. claims that
13  Christine Barin says it happened when she was four years old.
14  Christine Barin doesn't make that claim, so how do we decide?
15  If you can't decide, then the decision should be that they have
16  not shown by a preponderance of the evidence that mere
17  allegations, especially in the absence of the refutation of the
18  allegations that we've been making for eight months -- we
19  brought this up eight months ago and I fully would have
20  expected if we're going to get a last minute letter like was
21  sent yesterday, that at least it would have addressed those two
22  significant claims and yet we have absolutely nothing.
23      Your Honor, I ask the Court to rule that the Government
24  has not proved by a preponderance of the evidence that my
25  client should be given those five-point enhancements and rule

1    that the Guidelines are as suggested by the Defense.

2        Unless the Court has any other questions about that issue,

3    that's all I had on the Guideline issue.

4            THE COURT: I don't.  Thank you. Miss Woodward.

5            MS. WOODWARD: Thank you, Judge.  What Mr. Steingold

6    seemed to ignore in his argument is that we are here to

7    sentence his client for receiving child pornography, so I think

8    we start there.

9            THE COURT: No, we don't because this is about me

10   arriving at the proper Guidelines and nothing else is in

11   dispute besides these five points.

12           MS. WOODWARD: Understood.  All I mean is when he

13   argues that there's not a preponderance of the evidence that

14   the Defendant sexually assaulted C.B. and he identifies in his

15   mind what the "problems" are with her statement, what he

16   doesn't acknowledge is that his client later possessed child

17   pornography which shows that he has a sexual interest in

18   children.

19       But setting that aside for a moment, on this objection --

20           THE COURT: (Interjecting)  Miss Woodward, that

21   doesn't always translate into an interest in children.  I mean

22   we know there are tons and tons of child pornography cases that

23   don't include this kind of enhancement or even a suggestion, so

24   I'm not seeing the connection between the fact that he had

25   pornography of prepubescent children as proof that he did

1    something to children 20 or 30 years ago.

2              MS. WOODWARD: Understood, Your Honor.  For this

3    sentencing enhancement the Court needs to find that there's a

4    preponderance of the evidence that the Defendant engaged in two

5    instances of sexual misconduct against a minor.  Those two

6    instances would be one, C.B. and two, K.Z.  I'll just review

7    the evidence for the Court.

8         For C.B., she made a statement to the Washtenaw County

9    Sheriff's Department in 2011.  She also made a statement to

10    Agent Ratermann and she is present in court today and would be

11    available to testify if that was what the Court wished.

12    However, I think that there's clearly a preponderance of the

13    evidence for that single instance of sexual assault against a

14    minor.  That single instance doesn't get it us to the plus five

15    and then the Court needs to evaluate whether there's a

16    preponderance of the evidence for K.Z.

17              THE COURT: So what about some of the things that Mr.

18    Steingold has now said?

19              MS. WOODWARD: Specifically he asked why her letter

20    does not address the allegation that the Defendant claims that

21    she made an allegation against her father and that she asked

22    the Defendant to raise her child.

23              THE COURT: And the discrepancy in the age and perhaps

24    a polygraph and those points as well.

25              MS. WOODWARD: I didn't hear anything about a

1    polygraph.

2              THE COURT: I thought that I did.  Mr. Steingold, did

3    you say that there was a way to test the truthfulness?

4              MR. STEINGOLD:  I believe I addressed that in my

5    Sentencing Memorandum.

6              MS. WOODWARD: For the first two questions Mr.

7    Steingold raises, frankly Judge, I never asked Miss Barin if

8    she made an allegation against her father or if she asked the

9    Defendant to raise her child.  The only source of that

10   information is the Defendant and his wife.  I think it's clear

11   here that there is a lot of dispute in between the family

12   members and I found those allegations to be offensive and

13   hurtful and I did not ask her.  I can ask her right now, Your

14   Honor, but to me she had made a statement to Washtenaw County

15   that was very clear.  She then made a very clear unequivocal

16   statement to Agent Ratermann, and given that the standard here

17   is preponderance of the evidence, I didn't see it as my role to

18   ask her what I thought to be offensive questions based on what

19   the Defendant is saying about her.  If the Court is interested

20   in answers to those questions, I can certainly ask her and

21   she's here and she did come in from Illinois today, but that's

22   why those are not addressed in her statement because to recite

23   for her everything that happened at the detention hearing both

24   in duty court and here and all of the hurtful allegations that

25   were made against her, when what we're here to do is to

UNITED STATES v. TIMOTHY PAUL BARTH

```
 1   evaluate the Defendant was not something I was comfortable

 2   doing.

 3              THE COURT: No, I fully understand that, Miss

 4   Woodward.

 5       Miss Barin, where are you?  Hi.  So this may be very

 6   difficult for you, but you've heard what Mr. Barth's lawyer has

 7   just said, and a lot of it has to do with your credibility and

 8   would you mind coming forward and saying a few things?

 9              MS. BARIN:  No.

10              THE COURT: All right.   Please.  We're going to place

11   you under oath.

12              THE CLERK OF THE COURT: Would you raise your right

13   hand please?

14   __CHRISTINE BARIN, GOVERNMENT WITNESS, SWORN AT ABOUT 11:50 A.M.__

15              THE COURT: So, Miss Barin, you say in the letter you

16   gave -- sent to the Court that this happened when you were

17   eight and I think we've seen 10, we've heard four.  Can you

18   address that?

19              MS. WOODWARD: She may not know.  I believe that it's

20   only the cousin J.C. that said four.  The statements I've seen

21   from her say eight or nine or 10.

22              MS. BARIN:  I can be honest about that.  It did

23   happen a long, long time ago.  It only happened once.  When

24   traumatic things happen to you as a child you try to block out

25   a lot of things.  I don't know.  It's either the fight or
```

1   flight system.  I just don't exactly remember my age, but I can

2   honestly tell you that it did happen.  Yes, I didn't come forth

3   with it to my parents.  It took me a long time because we were

4   at a family reunion and my uncle just came up to me and he had

5   asked me and said oh, we can watch Brianna for you because I

6   had left with my cousins to go hang out with them and which is

7   my 13-year old daughter now present.  At the time she was

8   around eight, seven, and that just triggered in my head and I

9   ran to my father and had told him.  I don't know  --

10          THE COURT:  When you mentioned it to your dad, when

11   was that?

12          MS. BARIN:  That was around 2011, and then when I

13   told my father that, that's when he had told me you need to

14   tell the police about it.  At the moment I was hesitant because

15   I felt oh, it took so long.  What's it going to do now?  But my

16   father was right.  I had to speak up and here I am today to

17   speak up.

18          THE COURT: Another thing that Mr. Steingold said is

19   that you made an allegation against your father which turned

20   out to be --

21          MS. BARIN:  (Interjecting) I have never said anything

22   about my father.  I never asked them to raise my oldest

23   daughter.  We have had lots of problems.  My aunt, which is his

24   wife, my Tita Bona, she was having problems with her marital

25   issues because my Uncle Paul used to contact Heidi at the time

1    and give her money and stuff like that and help her through

2    school, which is the doctor right now and my aunt was upset

3    about that.  We would meet up in Chicago -- this was back in

4    probably 2008 or 2009, roughly around there, and I was having

5    problems with the father of my child, Brianna, and they offered

6    to help me and stuff like that, but I've turned it down because

7    my father has always helped me with her, help raise her and

8    that's it.  I have never asked them to take care of my daughter

9    or me.  I have never -- or to take us in their home.  None of

10   that.  They've offered me, but I turned it down.

11          THE COURT: What about the allegation -- so you're

12   saying you never made an allegation against -- that your father

13   abused you and you say that you never asked them to raise your

14   child?

15          MS. BARIN:  No.  Yes, my father has never abused me,

16   hurt me in any way.

17          THE COURT: And you never said it falsely?

18          MS. BARIN:  No, I have never falsely accused him or

19   even -- those words never came out of my mouth ever.

20          THE COURT: Mr. Steingold, do you have any questions?

21          MR. STEINGOLD:  Your Honor, what I would like is for

22   Bona Barth to address the Court because she's the source of

23   these allegations and she's indicated a desire to address the

24   Court about these specific allegations, if the Court would

25   allow.

UNITED STATES v. TIMOTHY PAUL BARTH

1              THE COURT: Do you have any questions, Miss Woodward?

2      **EXAMINATION BY MS. WOODWARD:**

3      Q.   While Miss Barin is up here I would just ask her since

4      we'll talk about K.Z. next, you have a cousin that has  the

5      initials K.Z., is that right?

6      A.   Kamille Zablim (phonetic), yes.

7      Q.   And when you were -- did you ever talk to Kamille about

8      this?

9      A.   As kids growing up when we would have get-togethers for

10     Christmas, Thanksgiving in Ann Arbor, Michigan at their

11     address, we would always play and then we'd always say oh, I

12     don't really want to go by Uncle Paul.  He always wanted to

13     squeeze us and hug us tight and I just always felt

14     uncomfortable, and then as children I opened up about it to her

15     and she's like oh yeah, he does that to me.  She's told me that

16     it never ended for her.  It probably ended up until she was

17     about 12 or something like that.  I don't remember exactly what

18     she had said.  We never really talked about this as we got

19     older.  We just suppressed the issue.  It was more as children

20     we just talked about it because we'd always try to stay away

21     from him as much as possible.

22             THE COURT: Have you talked to her lately?

23             MS. BARIN:  I have not, Your Honor.

24             THE COURT: Are you in contact with her?

25             MS. BARIN:  I could be, yes.

**UNITED STATES v. TIMOTHY PAUL BARTH**

```
 1              THE COURT: No, no.  I am just wondering.  Have -- do
 2    you have an ongoing relationship with her?
 3              MS. BARIN:  No, just only when I see her at family
 4    gatherings.
 5              THE COURT: And it hasn't come up since you spoke
 6    about it years ago?
 7              MS. BARIN:  No.
 8              THE COURT: Anything else, Miss Woodward?
 9              MS. WOODWARD: No, Your Honor.
10              THE COURT:  Miss Barin, thank you.  Thank you very
11    much.
12              MS. BARIN:  Thank you, Your Honor.
13              MS. WOODWARD: For K.Z., Your Honor, I'll be brief.  I
14    would just -- we have the facts that we have and those are that
15    what you just heard from Miss Barin, you have the report from
16    Agent Ratermann about his attempt to contact K.Z. He's also
17    available and he's here to testify today.  What he would say
18    and what is in his report is that on October 21st while he was
19    in the Chicago area, which is where K.Z. lives, he contacted
20    her by phone and he identified himself on the phone and told
21    her that he was calling about the Defendant and that he had
22    heard that she -- something about her and potential sexual
23    assault.  When she heard those words, she began to cry.  She
24    was nonresponsive.  The entire conversation if you can call it
25    that, was about five minutes long.  She said something to the
```

 1 effect of trying to move on with her life or put this behind

 2 her.  She then asked essentially to get back to Agent Ratermann

 3 about whether she wanted to speak with him about this and then

 4 later that day he received a call from her boyfriend who said

 5 that she needed additional time to think about it, and then a

 6 few days later her boyfriend called back and said that she

 7 didn't want to talk about it. So I think that's obviously very

 8 different than Heidi Barin who has written a letter to the

 9 Court and emphatically denied that anything happened.  And

10 those are the facts and I leave it up to the Court to determine

11 whether that satisfies a preponderance of the evidence for two

12 instances.

13           THE COURT: So Miss Woodward, we have K.Z. speaking to

14 J.C. and to Christine Barin years ago.

15           MS. WOODWARD: Correct.

16           THE COURT: And to Agent Ratermann in 2016.

17           MS. WOODWARD: Correct.

18           THE COURT: Thank you.

19           MS. WOODWARD: Thank you.

20           MR. STEINGOLD:  May I have Miss Barth come forward,

21 Your Honor?

22           THE COURT: Certainly.

23           MR. STEINGOLD: Your Honor, may she be placed under

24 oath?

25           THE CLERK OF THE COURT: Raise your right hand

```
 1    please.
 2        BONA M. BARTH, DEFENSE WITNESS, SWORN AT ABOUT 11:55 A.M.
 3    EXAMINATION BY MR. STEINGOLD:
 4    Q.    Tell the Court your name again.
 5    A.    My name is Bona Mattscheck Barth.
 6    Q.    You are the wife of the Defendant Timothy Paul Barth?
 7    A.    Yes.
 8    Q.    You are the aunt of Christine Barin who was just talking
 9    to the Court?
10    A.    Yes.
11    Q.    There's two issues I wanted to ask you about.  One is the
12    suggestion that she had previously made an allegation about her
13    father.  Could you tell the Court what basis you had for
14    telling us that?
15    A.    When my parents were alive, I talked to my mother because
16    I love my nieces and nephews.  She was so young then and my
17    brother was the one who usually take care of her when we have
18    her, so I talked to my mother.  Possibly this good idea would
19    take care of my niece, Christine, to adopt her for my daughter
20    because I don't have any other kid except my son, and my mother
21    cautioned me and said do not do that because that would cause
22    problem.  Even though you want to do that for the good of your
23    niece, I would advise you not to do that because the mother of
24    your niece is accusing your brother that he molested Christine.
25    So I said what are you talking about?  Because I would not
```

1  believe that because my brother is a good man.  He took care of

2  her and that's why my mother said that's why I don't want you

3  to do that for adopting Christine.  Just love them, help them

4  if they need it, but do not adopt Christine because of that

5  statement that apparently the mother of Christine when she was

6  young was even accusing my brother of molesting her.  That is

7  why I mentioned that.

8         THE COURT: So you're talking about adopting

9  Christine?

10        MRS. BARTH:  I wanted to adopt her.

11        THE COURT: This is different from taking care of her

12  daughter?

13        MRS. BARTH:  This is a different separate one.  This

14  is when my niece was very young, and she needed -- I thought

15  she needed more care, a mother care because my brother was not

16  married to her mother at the time.  They used to come with my

17  whole family in our home and I see my niece with her father.

18  They come with them.

19     And in regards to her daughter, it was my niece,

20  Christine, when she calls me at home when she was in trouble

21  with her relationship with the father of her daughter, she

22  wanted me to take care of her daughter and I said yes, if you

23  would come with her, the two of you could come because they

24  were living with her small daughter with the father of her son

25  at that time and she was really having a hard time and she

1    calls me and I would give her advice and I told her that if she

2    wants me to take care of her daughter she has to be with the

3    daughter.  I will not take care of her daughter if she is not

4    with her, but she did not want to do that.  She just want to

5    give me her daughter to take care of and I refused.

6                    THE COURT: When did this happen?

7                    MRS. BARTH:  This was oh, several years ago.

8                    THE COURT: Can you be a little more precise?

9                    MRS. BARTH:  Possibly --

10                   THE COURT: How old was her daughter then?  What is

11   the name of the daughter?

12                   MRS. BARTH:  Brianna.

13                   THE COURT: How old was Brianna at the time?

14                   MRS. BARTH:  This is when -- possibly like eight

15   years ago when this happened.

16                   THE COURT: How old is Brianna now?

17                   MS. BARIN:  She's 13.

18                   MRS. BARTH:  I don't remember exactly, but what I am

19   trying to emphasize, Your Honor, is that I was willing to help

20   them, to help my niece and her daughter, but I don't want her

21   leaving her daughter because I told her I will help you if you

22   come with your daughter.  I will not take her alone.  You going

23   to have to come with her.  I'll help you go to school.  I will

24   help you to start your life over again, but you cannot leave

25   your daughter alone, to just give her to me and you go and stay

1  in Chicago and live like a single parent and that is what I

2  mentioned to you.

3  Q.   (By Mr. Steingold continuing)  So I just want to make this

4  clear; that Christine Barin asked you and your husband to allow

5  her daughter to live with you?

6  A.   Yes.

7  Q.   That's what I wanted to ask.  Your Honor, I have nothing

8  else to ask Miss Barth.  I don't know whether Miss Woodward

9  would like to ask any questions.

10       THE COURT: Do you have any questions?

11  **EXAMINATION BY MS. WOODWARD:**

12  Q.   I just wanted to clarify.  Miss Barth, when we're talking

13  about your conversations with your mother about adopting

14  Christine, the information you got from your mother was that

15  Christine's mother had made an allegation against your brother,

16  correct?

17  A.   Yes.

18  Q.   Not that Christine herself had made any allegations?

19  A.   It was her mother according to my mom.  My mom is not

20  alive, so you cannot ask her.

21  Q.   Sure, but it was not an allegation by Christine that you

22  were aware of?

23  A.   Not that I am aware of.

24  Q.   Thank you, Judge.

25  A.   But I did not want to believe it because I know my brother

1   is a good man.

2          THE COURT: And so you didn't do anything.  You got

3   that information that there was some possible molestation and

4   what did you do with that information?

5          MRS. BARTH:  So I listened to my mother because I did

6   not believe that my brother would do that.

7          THE COURT: So you didn't -- my point is you didn't go

8   to law enforcement.  You didn't do anything with that because

9   you did not believe it could have happened?

10          MRS. BARTH:  No.

11          MR. STEINGOLD:  Your Honor, the only other matter I

12   wanted to address on the issue is the fact that they have to

13   have two instances, and so assuming that they're relying on the

14   second instances being something that happened to K.Z., what

15   I've heard from Christine Barin is that K.Z. would talk about

16   my client hugging her tight, an uncle hugging her niece tight.

17   I didn't hear any suggestion that my client touched her

18   inappropriately or molested her in any way, nor is there any

19   allegation by K.Z. to anyone, not to Agent Ratermann, not to

20   any law enforcement, not to an a parent, not to anyone else

21   that she was molested.  I fully expected to hear Christine

22   Barin come up here and tell you that K.Z. told her something

23   more specific that could be interpreted as molestation.  I

24   heard nothing of the kind.

25          Even if the Court were to credit Christine Barin's

1    statement, they have not carried the burden of showing a second

2    incident to sustain the addition of this five-point

3    enhancement, nor do I believe that a preponderance of the

4    evidence shows that Christine Barin was molested.  The

5    questions that remain unanswered cannot be answered.

6         You've heard conflicting stories now about the attempt to

7    have my client and his wife raise the child, but we have had

8    nothing to explain why she would have told her cousin that she

9    was four years old and while she's now saying she was eight to

10   10.  All of these questions remain unanswered and especially

11   with regards to K.Z.  I believe that the Government has not

12   sustained its burden.  The Court should not add the enhancement

13   and we should proceed to allocution.  Thank you, Your Honor.

14        THE COURT: Thank you.  Anything more, Miss Woodward?

15   I would -- I know what I just heard from C.B. I also know what

16   is outlined in the Presentence Investigation Report concerning

17   these incidents which the Court takes into account as well.

18        MR. STEINGOLD:  Thank you, Your Honor.

19        MS. WOODWARD: Thank you, Judge.  Yes, I think there's

20   a little more information in the reports, that are summarized

21   in the Presentence Investigation Report and that were attached

22   to my Memo about what Christine Barin said she was told by

23   K.Z., and I think it's more than what Mr. Steingold

24   represented.  I think today there's a desire not to get into

25   too many of the details, but I think the facts are before the

1    Court.

2         THE COURT: All right.  The issue before the Court is

3    whether the Court should include the enhancement which is

4    Paragraph 24 of the Presentence Investigation Report.  The

5    enhancement is based on the Sentencing Guideline 2G2.2(b)(5)

6    which allows the Court to adjust the Offense Level by five if

7    it finds by a preponderance of the evidence that the Defendant

8    previously engaged in a pattern of activity constituting the

9    sexual abuse or exploitation of a minor and it has to involve

10   at least two people.  The Government says that those two people

11   are nieces of Mr. Barth who have been identified as C.B. and

12   K.Z.

13        So the application note to 2G2.2 says that this pattern of

14   activity is present when a defendant commits at least two

15   separate instances of sexual abuse or exploitation.  The other

16   incidences need not have occurred during the course of the

17   charged offense, need not have involved the same minor or even

18   resulted in a conviction, and sexual abuse or exploitation

19   could be something that would be an offense under State law or

20   under Federal law something that it is a criminal offense to

21   engage in or to attempt to engage in a sexual act with a person

22   who has not attained the age of 12.

23        The Court does find by a preponderance of the evidence

24   that this enhancement should be applied.  There is some dispute

25   here concerning C.B.'s age when it happened, whether it was

1   when she was four, whether it was when she was eight or whether

2   she was 10.  What is important to the Court is that she was not

3   12 which would make this a violation certainly under the

4   Federal law if it -- if there were charges that were filed.

5        What supports the Court's finding and the Court can base

6   this finding on hearsay evidence, we have evidence that C.B.

7   reported this to her father -- although it was years after --

8   reported this to her father in 2011.  That prompted them to go

9   to law enforcement in 2011, and then there was another

10  statement that she made to Agent Ratermann in 2016.  All of

11  these statements outlined offensive touching, vaginal touching,

12  certainly things that would qualify as an offense of criminal

13  sexual conduct.

14       With respect to K.Z., we had the testimony of Miss Barin

15  this morning.  We also have more detailed statements that Miss

16  Barin gave that the cousin -- I'm getting my initials mixed up.

17  K.C., is that it?

18            MS. WOODWARD:  K.Z.

19            THE COURT:  K.Z. talked to J.C., talked to cousin

20  J.C. So we have K.Z. speaking to her cousin J.C. about this,

21  speaking to her cousin Christine Barin about this, speaking to

22  Agent Ratermann about it, and certainly being reluctant when

23  she talked to Agent Ratermann about the sexual conduct on the

24  part of Dr. Barth, but when she gave statements to J.C. and

25  C.B. earlier which the Court is inclined to credit, she too

1    outlined offensive sexual touching and much more detail of that

2    is in the Presentence Investigation Report and the Court does

3    not want to make it part of this record, but it's outlined in

4    Paragraphs 13 and 14 in the Presentence Investigation Report.

5         Just with respect to the delayed nature of these

6    statements, this Court is certainly no expert but certainly has

7    enough exposure to victims of sexual abuse to know there is

8    often repression of the events.  There is shame that

9    accompanies it.  There seems to be some family dynamics going

10   on here that would have made it difficult for people to come

11   forward.  We have the testimony today of Mrs. Barth herself who

12   got a report of sexual abuse; she didn't believe it and she did

13   nothing with the information.

14        So there are different approaches that people take to this

15   very heinous crime and the tragedy is that it is so

16   under-reported and that it really does effect people's lives

17   for years and years and years before they do do something about

18   it.

19        For all of those reasons, the Court finds by a

20   preponderance of the evidence that the five points at Paragraph

21   24 should stay and should be factored into the Offense Level.

22        Mr. Steingold, I think that will take care of your

23   objections.

24             MR. STEINGOLD:  I think so, Your Honor.

25             THE COURT: So let me just ask you.  Mr. Barth, you've

1    heard us now for the last hour.  Do you have any objections to

2    this Presentence Investigation Report that we have not talked

3    about today or that Mr. Steingold has now just waived because

4    of the Court's ruling.

5              MR. BARTH:  The Court has ruled, Your Honor.

6              THE COURT: So my question is do you have any other

7    objections that we should make part of this record?

8              MR. BARTH:  No I don't.

9              THE COURT: Thank you. So the Offense Level is 35.

10   The criminal -- you can take your seats.  The Criminal History

11   is One.  The Guideline range the Court must take into account

12   is 168 to 210 months.

13       I'll hear from you, Miss Woodward, on sentencing and then

14   from you, Mr. Steingold.

15             MR. STEINGOLD:  Thank you.

16             THE COURT:  And your client.

17             MR. STEINGOLD:  Thank you.

18             MS. WOODWARD: Thank you, Your Honor.  Although the

19   Government certainly advocated for and believes that the

20   five-level enhancement absolutely applies in this case which

21   results a Guideline range of 168 to 210 months, we are seeking

22   and do believe if the Court wishes to impose a below Guideline

23   sentence here that that is appropriate and the Government has

24   requested a sentence of 120 months.

25       The reason for that is as we look at this Defendant and at

**UNITED STATES v. TIMOTHY PAUL BARTH**

1   his conduct as he stands before the Court today, the Court has

2   to evaluate his aggravating and his mitigating factors and the

3   seriousness of the offense for child pornography offenders of

4   course is very serious, but Mr. Barth's conduct in relation to

5   other child pornography offenders, the Government does concede

6   it does not put him at the top of people who download and

7   distribute child pornography.  That is one of the reasons a

8   sentence less than 168 months is appropriate here.

9       He did look at child pornography for years.  It did depict

10  prepubescent girls engaged in sex acts with adult men, but the

11  size of his collection was around 4000 images and there's not

12  evidence that he was talking to minors online or talking to

13  other child pornography offenders, and I think that is

14  something the Court can consider.

15      A sentence of 120 months is significant and much higher

16  than the mandatory minimum here of five years.  I think that's

17  a sentence that would place Mr. Barth right where he should be

18  with other child pornography offenders.  It's a significant

19  sentence, but not greater than necessary to accomplish the

20  objectives of 18 U.S.C. 3553.  Thank you.

21          THE COURT: Thank you.  Mr. Steingold.

22          MR. STEINGOLD:  Your Honor, it's always a judgment

23  call what is sufficient but not greater than necessary.

24  There's a lot of factors the Court has to take into

25  consideration.  Most of them have been addressed in my

1    Presentence Memorandum.

2        I'm a bit devastated by the Court's ruling, especially

3    with regards to K.Z., but we have to accept it and move on.

4    The point is that if it did occur, we're talking about

5    something that happened 25 years ago or thereabouts.  It's hard

6    to say.  There's been no suggestion that my client has done

7    anything untowards anyone in the last 25 years.

8        As the Court knows, my client himself was a victim, was

9    treated severely when he was a juvenile in detention in

10   Chicago; that's been detailed in the Presentence Investigation

11   Report as well as in my Sentencing Memorandum, and he's had to

12   try to come to grips with what happened and the way that he

13   found some way to deal with it is in sympathizing and emulating

14   (sic) with the victims of child pornography.

15       There's never a good reason to view child pornography and

16   I'm certainly not trying to make an excuse for him, but I'm

17   suggesting that this is a man who has demonstrated throughout

18   his years and as attested to by the letters from not just Heidi

19   Barin, but also Father Arokiaselvan that he's a good man.  He's

20   devout Catholic, that he's devoted to his family.  He's devoted

21   to the Church.  He's devoted to doing good things for good

22   people and has done that for his entire life.  Both him and his

23   wife have been significant contributors to the welfare of the

24   family.  They feel it's their obligation to help those who

25   can't in their family do it for themselves, so they funded

1   people's education and they've done all the things that the

2   Court has read about.

3        Now my client is at the latter stages of his life and the

4   Court I know has read the letter of Dr. Tye (phonetic) that

5   details the myriad of physical problems that my client has to

6   deal with.  It think it was -- I kind of lost count of how many

7   things, but between the knees and the heart problems and the

8   paralysis and everything else, his life expectancy is not

9   expected to be 10 years.  I believe the life expectancy, and it

10  is put in Dr. Tye's (phonetic) report, I think it was 60 to 65%

11  or thereabouts to live five years and 30 to 35% to live 10

12  years.  So while the Prosecutor can say that that's not more

13  than necessary, percentage-wise it's a death sentence.  It is a

14  suggestion that my client will die in jail and the question is

15  whether or not that is necessary to achieve the goals of 18

16  U.S.C. Section 3553.  His life has been devastated.  His life

17  is ruined.  The family life is ruined.  The divisions between

18  my client's wife and the rest of her family are things that

19  will never be repaired.

20       He is not going to go -- to commit any other crimes.  He's

21  not physically capable of moving, let alone doing anything like

22  is suggested he did in the past.

23       When you talk about deterrence, I don't think giving my

24  client a departure down to the five-year minimum is going to

25  encourage anybody to engage in child pornography.

1        In terms of punishment, five years at this stage of his

2    life with his physical infirmities is a severe punishment, and

3    the supervised release that will follow is not going to be much

4    easier.

5        My client is barely able to be mobile.  I'm asking this

6    Court to consider the departure I requested under U.S.S.G.

7    Sections 5H1.1 and 5H1.4 dealing with his age, as well as his

8    health history and rule that five years is sufficient but not

9    greater than necessary, and I can only hope and pray that my

10   client lives through those five years.

11           THE COURT: Thank you.  Mr. Barth, do you wish to

12   address the Court?

13           MR. BARTH:  Yes, Your Honor.  I pleaded guilty to

14   receiving child pornography.  I never minimized or justified my

15   crime.  When asked in April if my guilty plea was the best

16   thing for me, I was speechless.  I pleaded guilty because it

17   was the right and honest thing to do, not as a matter of what

18   was best for me.

19       I consistently stated I used my computer to download child

20   pornography, even though the initial exposure was a pop-up in

21   late 2012. Government forensic investigation has confirmed I

22   never contacted, solicited or shared these pictures with

23   others.

24       My crime has had far-reaching unfortunate consequences for

25   my family.  They have been devastated by humiliation, shame and

1  scorn.  I don't deny my culpability and I am entirely

2  responsible for the evil they have encountered and I am

3  entirely responsible in this regard.

4      I assure the Court, both my wife and son had no knowledge

5  of my interests viewing or downloading of any pornographic

6  images of any sort.

7      I apologize to my wife.  I'm deeply sorry for my betrayal,

8  the injuries and harm I caused you, our son, our grandchildren

9  and the rest of your family.  I hope that in the future they

10  are somehow restored to you.

11      I know your retirement savings has been stolen as legal

12  fees, fines and charges diminished the savings which have been

13  planned for our mutual benefit.  Your continuing humiliation,

14  deep shame, isolation from community, church family and

15  friends, hopelessness and helplessness, all I caused you by my

16  actions are the source of my greatest remorse.  I know you are

17  losing me.  I thank you for your extraordinary loyalty.  I hope

18  to live long enough to return to you if it is still your wish.

19      I want to thank my church and its clergy for offering me

20  reconciliation, pastoral visits and mass in our home during my

21  home incarceration.  This includes Father Arokiaselvan who's

22  here today.

23      I want to thank my psychotherapist who every 16 months has

24  provided me with invaluable assistance in understanding what

25  happened to me and its consequences at a time in my life when

1   language, especially about emotions and feelings, was

2   incoherent in my early adolescent mind.

3        Finally, I want to thank Your Honor for allowing me to be

4   home for the past eight months to support and comfort my wife

5   in this time of abandonment by family and friends.  I realize

6   that it is the innocent, both in my family and especially the

7   children sexually abused in the downloaded pictures that

8   constitute the victims of my offense.  My childhood experiences

9   caused me to identify with their soul deadening, degradation

10  and shame.  To compound these victims' injury and indignity

11  with my contribution to the demand for such images I'm truly

12  sorry and ask forgiveness.

13       Your Honor, I understand the law and your judicial

14  responsibility.  I will comply with the proffered sentences

15  just, merciful and required recompense for my offenses.  Thank

16  you.

17            THE COURT: Thank you.  Anything more, Mr. Steingold?

18            MR. STEINGOLD:  Nothing, Your Honor.

19            THE COURT: Anything more, Miss Woodward?

20            MS. WOODWARD: No, Your Honor.

21            THE COURT: Thank you.  You can take your seats.  So

22  the Court announced that the Offense Level here is 35.  The

23  Criminal History Category is one and the Guideline range is 168

24  to 210 months.

25       The Court must decide whether a sentence within that range

1   or below it or above it is a sentence that is sufficient but

2   not greater than necessary.

3        The Court does believe that a sentence below that

4   Guideline range is one that would be -- would serve the

5   purposes of the Sentencing Statute.  Let me just talk a little

6   bit about some of the Court's considerations.

7        Just as a starting point, Mr. Barth and Mr. Steingold, you

8   both say that his life is ruined, that his family has been

9   devastated by shame and by scorn and I'm almost hearing as an

10  after-thought that the children who are depicted in this type

11  of child pornography are -- their lives are devastated by

12  shame, by scorn.  Their lives are ruined because somewhere

13  there had to be children used to create these videos, and while

14  in the whole scheme of things the number of images that Mr.

15  Barth may have had in his possession are small compared to

16  others who have pled guilty to this crime, the long-lasting

17  effect on victims of child pornography certainly cannot be

18  taken for granted, and they didn't bring this upon themselves.

19  They didn't bring the ruin, the devastation, the shame, the

20  scorn.  They didn't do that to themselves; you did this to

21  yourself.  You did it to your family, and so what has happened

22  in your family is frankly one of the Court's least

23  considerations.

24       So I say that to emphasize how serious I consider this to

25  be, how important it is for a sentence to reflect that and to

1    serve as a deterrent and who knows if any of these sentences

2    are having any kind of deterrent effect, but those who are part

3    of this industry of child pornography really do have to

4    understand that they are not the victims because they got

5    caught and because they are facing a lot of time in prison.

6           Mr. Steingold has asked the Court to take into account

7    certain considerations that could cause your sentence to be

8    reduced and I think that those considerations do have merit.

9    The Court is well aware of your age.  I believe you're 67 now;

10   is well aware of the many fold physical ailments that are

11   outlined in the Presentence Investigation Report and in the

12   Sentencing Memorandum, the mental health issues, your own

13   history of abuse, the fact that you have sought treatment for

14   this attraction that you have to child pornography, those are

15   all things that factor in your favor, Mr. Barth, but they

16   certainly don't warrant the kind of discount that Mr. Steingold

17   is asking the Court to give to your sentence.

18          So I have taken into account all of the considerations

19   that the Court must take into account under the Sentencing

20   Reform Act of 1984.  The Court has considered the Sentencing

21   Guidelines and the factors in 3553(a).  The Court does sentence

22   you to the custody of the Bureau of Prisons for a term of 100

23   months.

24          Upon release from prison, Defendant is placed on

25   supervised release for a term of five years.

 1          It is further ordered that Defendant pay a Special

 2   Assessment of $100; it's due immediately.

 3          You are also responsible for paying a $5000 assessment

 4   pursuant to the Justice for Victims of Trafficking Act; that is

 5   due immediately.

 6          The Court -- and I need to ask you this, Miss Woodward.  I

 7   know that the Rule 11 talked about perhaps $5000 in restitution

 8   to each victim.  Has anyone filed any kind of claim?

 9          MS. WOODWARD: No, Your Honor.

10          THE COURT: Given that then, the Court waives the cost

11   of incarceration and waives the cost of supervision, but the

12   Court is going to impose a fine on Mr. Barth.  The Court has

13   looked at your financial resources; they are significant and

14   the Court imposes a fine of $20,000.

15          Mandatory drug testing condition is suspended based on the

16   Court's determination that Defendant poses a low risk of future

17   substance abuse.

18          While on supervision, Defendant is to abide by the

19   standard conditions adopted by this Court and shall comply with

20   the following special conditions:

21          Due to Defendant's self-reported history of mental or

22   emotional problems, he is to submit to a psychological or

23   psychiatric evaluation as directed by Probation, if necessary

24   and Defendant is to participate in a program approved by

25   Probation for mental health counseling.

1          Due to Defendant's personal history and the

2     characteristics of this offense, these conditions are ordered:

3          He's to comply with the requirements of the Sex Offender

4     Registration and Notification Act as directed by Probation, the

5     Bureau of Prisons or any State Offender Registration Agency in

6     which you reside.

7          Defendant is not to associate with minor children under

8     the age of 18 except in the presence of a responsible adult who

9     is aware of the nature of your background and current offense

10    without prior approval of Probation.

11         Defendant is not to have unsupervised contact with your

12    own minor children at the discretion of the probation officer.

13         Defendant is not to frequent places where children

14    congregate on a regular basis.

15         Defendant is to notify anyone that you may subsequently

16    date or marry with minor children under the age of 18 of this

17    conviction.

18         Defendant is not to purchase, sell, view or possess images

19    in any form of media or live venue that depict pornography,

20    sexually explicit conduct, child erotica or child nudity, and

21    Defendant is not to patronize anyplace where this material or

22    entertainment is available.

23         Defendant is to have employment pre-approved by Probation

24    and you shall not be employed at or participate in any

25    volunteer activities that involve contact with minors under the

1    age of 18 or adults with disabilities without prior approval.

2         You are to have all residences pre-approved by Probation,

3    and you shall not provide care or live in a residence where

4    children under the age of 18 or adults with disabilities reside

5    without prior approval.

6         Defendant is to provide Probation with accurate

7    information about all computer systems, all passwords and

8    Internet service providers that Defendant has potential access

9    to and abide by all rules of the Probation Department's

10   Computer Monitoring Program, and you shall only access the

11   computer that's been approved by Probation.

12        You also are to consent to Probation conducting periodic

13   unannounced examinations of all computer systems, which may

14   include computer monitoring software at your expense.

15        For the purpose of accounting for all computers, hardware,

16   software and accessories, Defendant is to submit yourself, your

17   computer, your home to searches conducted by Probation at a

18   reasonable time and manner.  You're to inform any other

19   residents that your premises and your computer may be subject

20   to these periodic searches.

21        You are to provide Probation with access to any requested

22   financial information, including billing records for telephone,

23   cable, Internet and the like.

24        You are also to submit yourself, your home, your office,

25   your vehicles, your papers, your business or place of

1   employment and any property under your control to a search.

2   This search is to be conducted by a probation officer at a

3   reasonable time and in a reasonable manner based upon a

4   reasonable suspicion of contraband or evidence of a violation

5   of a condition of release, and failure to submit to the search

6   may be grounds for revocation.  You are to warn any residents

7   who live with you that your premises may be subject to search.

8        You are to successfully complete any sex offender

9   diagnostic evaluations, treatment or counseling programs as

10   directed by Probation.  Reports pertaining to sex offender

11   assessments and treatment shall be provided to Probation and

12   based on your ability to pay, you are to pay the cost of any

13   diagnostic evaluations, treatments or counseling programs in an

14   amount determined by Probation.

15        You are to -- you must submit to periodic polygraph tests

16   at the discretion of Probation as a means to insure compliance

17   with the requirements of supervision or treatment.  No

18   violation proceeding will arise solely on the result of a

19   polygraph examination.  Based on Defendant's ability to pay,

20   you will pay for polygraph examinations.

21        Defendant is to make monthly installment payments on any

22   remaining balance of any restitution that may be imposed,

23   Special Assessment and Assessment pursuant to the Justice for

24   Victims of Trafficking Act at a rate and schedule approved by

25   Probation.

UNITED STATES v. TIMOTHY PAUL BARTH

1          You are to not incur any new credit charges or open

2    additional lines of credit without approval of Probation unless

3    you are in compliance with any payment schedule imposed on you.

4          And finally, you are to provide the probation officer

5    access to any requested financial information.

6          That is the sentence of this Court.  Are there any

7    objections?

8               MR. STEINGOLD:  None, Your Honor.  I would make two

9    requests.  First, that the Court consider a recommendation to

10   the Federal Bureau of Prisons that my client be designated to a

11   medical facility.  I believe Buttner, Springfield and Rochester

12   are all potential facilities that are best suited to treat the

13   myriad of medical issues that confront my client.

14         I would also ask the Court to adopt a recommendation of

15   Pretrial Services and allow my client to self-report when

16   designated to the institution.

17              THE COURT: Thank you.  Miss Woodward?

18              MS. WOODWARD: No objections to the sentence, Your

19   Honor, or to Mr. Steingold's request that the Defendant be

20   allowed to self-surrender.

21         I would just put the forfeiture on the record here that

22   the Defendant has agreed to forfeit property identified in the

23   Amended Preliminary Order of Forfeiture that was entered on

24   July 28th and that forfeiture of that property is part of the

25   Defendant's sentence and we request that it be included in this

UNITED STATES v. TIMOTHY PAUL BARTH

1    Judgment, and then I would move to dismiss the remaining count.

2         MR. STEINGOLD:  We have no objection.

3         THE COURT: Thank you.  The Court will put in this

4    Judgment -- will recommend a medical facility, will allow Mr.

5    Barth to self-surrender and the Court will sign the amended

6    stipulated Preliminary Order of Forfeiture.  Anything else?

7         MR. STEINGOLD:  Nothing, Your Honor.

8         MS. WOODWARD: No, Your Honor.

9         THE COURT: Thank you.  We're adjourned.

10        **(Proceedings adjourned at about 12:40 p.m.)**

11                        - - -

12            **COURT REPORTER'S CERTIFICATION**

13   STATE OF MICHIGAN)

14                   )  SS.

15   COUNTY OF WAYNE  )

16        I, Janice Coleman, Federal Official Court Reporter, in and

17   for the United States District Court for the Eastern District

18   of Michigan, do hereby certify that pursuant to Section 753,

19   Title 28, United States Code, that the foregoing is a true and

20   correct transcript of the stenographically reported proceedings

21   held in this matter and that the transcript page format is in

22   conformance with the regulations of the Judicial Conference of

23   the United States.

24                        /S/ JANICE COLEMAN

25                        JANICE COLEMAN, CSR NO. 1095, RPR

```
 1                      FEDERAL OFFICIAL COURT REPORTER

 2

 3      DATED:  September 20, 2017

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```